853 So.2d 434 (2003)
LIGGETT GROUP INCORPORATED; Brooke Group Limited; Philip Morris Incorporated; Council for Tobacco Research-USA, Incorporated; Tobacco Institute, Incorporated; Lorillard Tobacco Company; Lorillard, Incorporated; Brown & Williamson Tobacco Corporation; American Tobacco Company; and R.J. Reynolds Tobacco Company, Appellants,
v.
Howard A. ENGLE, M.D., et al., Appellees.
Nos. 3D00-3400, 3D00-3206 to 3D00-3208, 3D00-3210, 3D00-3212, 3D00-3215.
District Court of Appeal of Florida, Third District.
May 21, 2003.
Rehearing and Rehearing Denied September 22, 2003.
*440 Steel Hector & Davis, and Alvin B. Davis; Clarke Silverglate Campbell Williams & Montgomery, and Mercer B. Clarke, and Kelly A. Luther; Kasowitz, Benson, Torres & Friedman, and Marc E. Kasowitz, Daniel R. Benson, and Aaron H. Marks (New York), for Appellants, Liggett Group Inc. and Brooke Group Holding, Inc.
Shook, Hardy & Bacon, and Norman A. Coll; Winston & Strawn, and Dan K. Webb, and Stuart Altschuler (Chicago, Illinois); Dechert Price & Rhoads, and Robert C. Heim, and Joseph Patrick Archie (Philadelphia, Pennsylvania), for Appellant, Philip Morris Incorporated.
Carlton Fields, and Benjamine Reid, and Wendy F. Lumish; Jones, Day, Reavis & Pogue, and James R. Johnson, and Diane G. Pulley (Atlanta, Georgia); Jones, Day, Reavis & Pogue, and Robert H. Klonoff, and Charles R.A. Morse (Washington, D.C.), for Appellant, R.J. Reynolds Tobacco Company.
Adorno & Yoss, and Anthony N. Upshaw; King & Spalding, and Gordon A. Smith, and Richard A. Schneider, and Barry Goheen, and Stephen B. Devereaux (Atlanta, Georgia), for Appellant, Brown & Williamson.
Greenberg Traurig, and Arthur J. England, Jr., and David L. Ross, and Elliot H. Scherker; Shook, Hardy & Bacon, and James T. Newsom (Kansas City, Missouri), for Appellants, Lorillard, Inc., and Lorillard Tobacco Company.
Debevoise & Plimpton, and Joseph P. Moodhe (New York), for Appellant, Counsel for the Council for Tobacco Research-U.S.A., Incorporated.
Renaldy J. Gutierrez, and Kathleen M. Sales; Covington & Burling, and James A. Goold (Washington, D.C.), for Appellant The Tobacco Institute, Incorporated.
Stanley M. Rosenblatt, and Susan Rosenblatt, for Appellees.
Before LEVY, GERSTEN, and GODERICH, JJ.
Rehearing and Rehearing En Banc Denied September 22, 2003.
GERSTEN, J.
This is an appeal from a final judgment in a smokers' class action law suit seeking damages against cigarette companies and industry organizations for alleged smoking related injuries. The final judgment awarded $12.7 million in compensatory damages to three individual plaintiffs, and $145 billion in punitive damages to the entire class. We reverse with instructions that the class be decertified.

I. Overview

In May of 1994, six named individuals filed a class action complaint seeking damages for injuries allegedly caused by smoking. All six alleged they were unable to stop smoking because they were addicted to nicotine and, as a result, developed medical problems ranging from cancer and heart disease to colds and sore throats.
*441 They sought over $100 billion in compensatory damages on theories of strict liability, negligence, breach of express warranty, breach of implied warranty, fraud, conspiracy to commit fraud, and intentional infliction of emotional distress. In addition, the plaintiffs sought over $100 billion in punitive damages on their claims for fraud, conspiracy, and emotional distress. The defendants are the major domestic cigarette companies and two industry organizations (hereafter collectively referred to as "defendants").[1]
The class of smokers and their survivors (hereafter collectively referred to as "plaintiffs") was certified in October of 1994 as a nationwide class action under Florida Rule of Civil Procedure 1.220(b)(3). The trial court defined the class as: "All United States citizens and residents, and their survivors, who have suffered, presently suffer or have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine."
Thereafter in 1996, this Court reduced the class to include Florida smokers only. R.J. Reynolds Tobacco Co. v. Engle, 672 So.2d 39 (Fla. 3d DCA 1996). This Court did not approve any trial plan for the case, because no trial plan had been issued at that time.
In February of 1998, the trial court issued its first trial plan, which provided for the trial proceedings to be divided into three phases.[2] Phase 1 consisted of a year-long trial on liability and entitlement to punitive damages. The jury considered common issues relating exclusively to defendants' conduct and the general health effects of smoking. At the conclusion of Phase 1, the jury rendered a verdict for the class on all counts.
In Phase 2, the jury determined that the three individual class representatives were entitled to compensatory damages in varying amounts which were offset by their comparative fault. The total award was $12.7 million. Thereafter, the jury determined the lump-sum amount of punitive damages for the entire class to be $145 billion, without allocation of that amount to any class member.
The defendants filed several post-verdict motions, including motions for remittitur and class decertification. The trial court *442 did not hold hearings on the post-verdict motions. Instead, in November of 2000, the trial court entered an "Omnibus Order on All Pending Motions" denying most of the defense motions, with two minor exceptions.[3] The Omnibus Order granted judgment in the plaintiffs' favor in all other respects, ordering immediate payment to the individual plaintiffs, and directing the defendants to immediately pay the $145 billion in punitive damages into the court registry for the benefit of the entire class. The trial court reserved jurisdiction to "conduct further proceedings pursuant to the mandate of the Third District Court of Appeal"an apparent reference to the coming Phase 3 trials and this Court's 1996 ruling that individual hearings are required "on at least the issue of damages, if not other issues as well." R.J. Reynolds Tobacco Co. v. Engle, 672 So.2d at 41.
In Phase 3, which has not yet begun, new juries will decide the individual liability and compensatory damages claims for each class member (estimated to number at least 700,000). The trial court will then divide the $145 billion punitive damages award equally among the successful class members. Pursuant to the Omnibus Order, interest on the $145 billion punitive award began accruing immediately at $14.5 billion annually. The defendants now appeal the adverse Omnibus Order.

II. Class Decertification Required

Although the emotional appeal of the class representatives' claims is compelling, our job as appellate judges is not to be swayed by emotion where to do so results in violating established legal principles. The law in the instant case clearly mandates that the trial court order certifying the class be reversed, with instructions that the class members may pursue their claims on an individualized basis.
Under Florida Rule of Civil Procedure 1.220(d)(1), a class-certification order may be altered or amended at any time before entry of a judgment on the merits. Class-certification orders necessarily precede substantial development of the issues and facts. For this reason, a court is required to reassess its class rulings as the case develops. See Barnes v. American Tobacco Co., 161 F.3d 127, 140 (3d Cir. 1998); In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Product Liab. Litig., 55 F.3d 768, 792 n. 14 (3d Cir.1995); Stott v. Haworth, 916 F.2d 134, 139 (4th Cir.1990); Kuehner v. Heckler, 778 F.2d 152, 163 (3d Cir.1985); Richardson v. Byrd, 709 F.2d 1016, 1019 (5th Cir.1983). Thus, even after a certification order is entered, "the judge remains free to modify it in the light of subsequent developments in the litigation." Forehand v. Florida State Hosp., 89 F.3d 1562, 1566 (11th Cir.1996).
In 1996, this Court affirmed as modified the trial court order certifying the class. See R.J. Reynolds Tobacco Co., et al. v. Engle, et al., 672 So.2d 39 (Fla. 3d DCA 1996). At that time, we limited the case to a Florida-only class based upon our finding that a nationwide class would be unmanageable because it would comprise in excess of one million class members. See R.J. Reynolds Tobacco Co., et al. v. Engle, et al., 672 So.2d at 41. This was the first smokers' case to be certified as a class action anywhere in the country. At the time of certification, no trial plan had been *443 issued and the plaintiffs estimated the class size at approximately 300,000 people.
Two years after class certification, the trial court issued its first trial plan. As finally implemented, the plan provided that trial would be divided into three phases. In Phase 1, which has been completed, the jury made a general finding that smoking causes some, but not all, of the diseases in issue and that cigarettes containing nicotine are addictive. The jury also made a general finding that the defendants had engaged in unspecified conduct that "rose to a level that would permit a potential award or entitlement to punitive damages."
In Phase 2, which has also been completed, the same jury found the three class representatives established liability and compensatory damages with respect to their individual claims. The jury then awarded a lump sum of $145 billion dollars in punitive damages to the entire class, without allocation to any class member.
The trial plan provides that Phase 3, which has not yet begun, will consist of a series of individual trials before new juries to determine whether the defendants are liable to the other class members, and the amount of any compensatory damages. The plaintiffs have now more than doubled their original estimate of class size from 300,000 to at least 700,000. After completion of the estimated 700,000 or more class member individual trials, the plan provides that the trial court will then equally divide the $145 billion dollar lump-sum punitive award among the successful class members.
The defendants objected to the trial plan and filed their first motion to decertify the class in 1998. The trial court denied the motion, although it expressed "reservations about the manageability of this case" and predicted that "the necessary individual hearings will place a serious demand upon Florida's judicial resources."
The denial of decertification was then appealed to this Court. This Court dismissed the appeal for lack of jurisdiction, but expressly stated that the defendants had a right to obtain review of "the propriety of the order by plenary appeal from any adverse final judgment."[4]
In the years since initial affirmance of certification in 1996, virtually all courts *444 that have addressed the issue have concluded that certification of smokers' cases is unworkable and improper. See Barnes v. American Tobacco Co., 161 F.3d 127 (3d Cir.1998), cert. denied, 526 U.S. 1114, 119 S.Ct. 1760, 143 L.Ed.2d 791 (1999); Castano v. American Tobacco Co., 84 F.3d 734 (5th Cir.1996); Estate of Mahoney v. R.J. Reynolds Tobacco Co., 204 F.R.D. 150 (S.D.Iowa 2001); Badillo v. American Tobacco Co., 202 F.R.D. 261 (D.Nev.2001); Guillory v. American Tobacco Co., 2001 U.S. Dist. LEXIS 3353 (N.D.Ill. Mar. 19, 2001); Aksamit v. Brown & Williamson Tobacco Corp., 2000 U.S. Dist. LEXIS 18880 (D.S.C. Dec. 29, 2000); Walls v. American Tobacco Co., 2000 U.S. Dist. LEXIS 16040 (N.D.Okla. Oct. 19, 2000); Chamberlain v. American Tobacco Co., 70 F.Supp.2d 788 (N.D.Ohio 1999); Hansen v. American Tobacco Co., 1999 U.S. Dist. LEXIS 11277 (E.D.Ark. July 21, 1999); Thompson v. American Tobacco Co., 189 F.R.D. 544 (D.Minn.1999); Clay v. American Tobacco Co., 188 F.R.D. 483 (S.D.Ill. 1999); Insolia v. Philip Morris, Inc., 186 F.R.D. 535 (W.D.Wis.1998); Emig v. American Tobacco Co., 184 F.R.D. 379 (D.Kan.1998); Barreras Ruiz v. American Tobacco Co., 180 F.R.D. 194 (D.P.R.1998); Smith v. Brown & Williamson Tobacco Corp., 174 F.R.D. 90 (W.D.Mo.1997); Tijerina v. Philip Morris Inc., 1996 WL 885617 (N.D.Tex. Oct.8, 1996); Philip Morris, Inc. v. Angeletti, 358 Md. 689, 752 A.2d 200 (2000); Reed v. Philip Morris, Inc., 1997 WL 538921 (D.C.Super.Ct. Aug. 18, 1997), and on second motion, No. 96-5070 (D.C.Super.Ct. July 23, 1999); Small v. Lorillard Tobacco Co., 252 A.D.2d 1, 679 N.Y.S.2d 593 (1998), aff'd, 94 N.Y.2d 43, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1999); Geiger v. American Tobacco Co., 181 Misc.2d 875, 696 N.Y.S.2d 345 (N.Y.Sup. Ct.1999), aff'd, 277 A.D.2d 420, 716 N.Y.S.2d 108 (N.Y.App.Div.2000).
These class action decisions all applied rules that are functionally identical to Florida's class action rules.[5] In many instances these courts denied certification based upon the demonstrated problem in the instant case. Simply, that the plaintiffs smokers' claims are uniquely individualized and cannot satisfy the "predominance" and "superiority" requirements imposed by Florida's class action rules.[6]See Barnes v. American Tobacco Co., 161 F.3d at 149 (certification improper because smokers' claims involve "individual issues" such as "nicotine addiction, causation,... contributory/comparative negligence and the statute of limitations"); Badillo v. American Tobacco Co., 202 F.R.D. at 263-65 (proposed class of persons exposed to second-hand smoke improper for certification because of individual issues of "causation, comparative fault, assumption of the risk, product identification, *445 statute of limitations, and damages"); Thompson v. American Tobacco Co., 189 F.R.D. at 551-52 (refusing to certify because individual issues predominated); Emig v. American Tobacco Co., 184 F.R.D. at 387-95 (refusing to certify because smokers' claims are individualized); Barreras Ruiz v. American Tobacco Co., 180 F.R.D. at 196-99 (refusing to certify for failure to satisfy requirements of commonality, representativeness, and fairness).[7]
To be certified, a class must satisfy the prerequisites of Florida Rule of Civil Procedure, Rule 1.220. Rule 1.220(a) requires that common issues of law predominate over the different individual issues at the core of each class member's claim. See Stone v. Compuserve Interactive Serv's, Inc., 804 So.2d 383 (Fla. 4th DCA 2001). This "predominance" or "commonality" requirement is not satisfied, where claims involve factual determinations unique to each plaintiff. See Execu-Tech Bus. Sys. Inc. v. Appleton Papers, Inc., 743 So.2d 19 (Fla. 4th DCA 1999).
Rule 1.220 also requires that class representation be superior to other available methods of fairly and efficiently adjudicating the claims presented. See Castano v. American Tobacco Co., 84 F.3d at 734; Emig v. American Tobacco Co., 184 F.R.D. at 379; Humana, Inc. v. Castillo, 728 So.2d 261 (Fla. 2d DCA 1999). If significant individual issues exist, little value is gained by proceeding as a class action. Not only would the lawsuit become unmanageable, it would further be unjust to bind absent class members to a negative decision where the class representative's claims present different individual issues than those of the absent members. Under these circumstances, class representation would not be "superior" to individual suits for the fair and efficient adjudication of the controversy. See Fla. R. Civ. P. 1.220(b)(3).
Phase 2 of the trial conclusively established that individualized issues of liability, affirmative defenses, and damages, outweighed any "common issues" in this case, and that class representation is not superior. Specifically, concrete proof relating to the class representatives; Mr. Amodeo, Ms. Farnan, and Ms. Della Vecchia, established that individualized issues predominate and render further proceedings unmanageable.[8]
*446 As evidenced by the proceedings in Phase 2, each claimant will have to prove that his or her illness not only was caused by smoking, but was also proximately caused by defendants' alleged misconduct.[9] For example, with respect to any misrepresentation claim, each Phase 3 claimant will have to prove that he or she actually and reasonably relied on a false statement of material fact. This requires an individualized showing of reliance.[10]See Shoma Dev. Corp. v. Vazquez, 749 So.2d 1287, 1289 (Fla. 3d DCA 2000)(class action not appropriate for fraud claims; reliance of one purchaser does not establish that of others); Castano v. American Tobacco Co., 84 F.3d at 745 ("fraud class action cannot be certified when individual reliance will be an issue"); Clay v. American Tobacco Co., 188 F.R.D. at 492 (denying certification of claims alleging fraudulent marketing of cigarettes because "all members of the proposed class were not subjected to the same advertising and that advertising did not have a similar effect on all members.").[11]
Because each class member had unique and different experiences that will require the litigation of substantially separate issues, class representation is not "superior" *447 to individual suits. See Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180 (9th Cir.2001); Haley v. Medtronic, Inc., 169 F.R.D. 643 (C.D.Cal.1996); see also Barnes, 161 F.3d at 145-46 (proof of general causation in cigarette litigation does not establish tort liability); In re "Agent Orange" Product Liab. Litig., 818 F.2d 145, 164-65 (2d Cir.1987) (Main issue "is not whether [defendant's product] has the capacity to cause harm, the generic causation issue, but whether it did cause harm and to whom.").
This is further evidenced by the fact that affirmative defenses and damages must be litigated individually.[12] This Court has already recognized that damages require individualized proof. See Engle, 672 So.2d at 41. Particularly in this type of smoking case where proof of damages is essential to liability, damages cannot be determined on a class-wide basis because the issue of damages requires individualized proof with regard to each smoker.[13]See Execu-Tech Bus. Sys., Inc. v. Appleton Papers, Inc., 743 So.2d at 19 (class certification improper because "the issue of damages and impact in the case simply `does not lend itself to [a mechanical calculation] but requires separate mini-trials, of an overwhelming[ly] large number of individual claims'"); Smith v. Texaco, 263 F.3d 394 (class members who "challenge[d] broad policies and practices that were applied in a non-standard way" could not assert uniform injuries and were required to prove punitive damages individually), opinion withdrawn, cause dismissed by, 281 F.3d 477 (5th Cir.2002); Lienhart v. Dryvit Sys., Inc., 255 F.3d 138, 147 (4th Cir.2001) (impermissible to determine damages on a class-wide basis when the governing law requires individualized proof of damages; common issues may not predominate where proof of damages is essential to liability); Windham v. American Brands, Inc., 565 F.2d 59 (4th Cir.1977)(common issues did not predominate even though the case presented a common question of violation, because there existed individualized issues of injury and damage).
Similarly, individualized choice-of-law issues demonstrate that class proceedings in the instant case are unmanageable and cannot be viewed as superior to individual litigation. See Stone v. Compuserve Interactive Serv., Inc., 804 So.2d at 383 (class certification improper where, among other things, individualized choice-of-law inquiries *448 are required); see also Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1190 (9th Cir.2001) (certification improper because of "individualized issues and variances in state law"); Castano v. American Tobacco Co., 84 F.3d at 741-44 (discussing how variations in state law can "swamp any common issues and defeat predominance").
For choice-of-law purposes, Florida law utilizes the "most significant relationship" test which provides that: "The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties." Bishop v. Florida Specialty Paint Co., 389 So.2d 999, 1001 (Fla.1980) (internal citation omitted); see also, Ryder Truck Rental, Inc. v. Rosenberger, 699 So.2d 713, 715 (Fla. 3d DCA 1997).
Applying Florida's "most significant relationship" test to the present case, the trial court was required to take into account a variety of factors beyond the place where the cause of action arose. During pretrial proceedings, undisputed evidence showed that nearly 50% of Florida residents who are over 50 years oldthose most likely to be class membersmoved to Florida after reaching age 50. Moreover, more than 65% of all current and former smokers in Florida moved here after they became regular smokers. The demographic evidence presented at trial strongly suggested many class members were not Florida residents at the time of diagnosis or manifestation.[14]
If diagnosis or manifestation did not occur during residency in Florida, each court in the Phase 3 proceedings will have to perform a full choice-of-law analysis and apply the law of the state with the most significant relationship to the parties and the occurrence. Especially in a state which has a highly transient population, choice-of-law problems present an insuperable roadblock to smokers' class actions, even where the class is limited to one state's residents. See Reed v. Philip Morris, Inc., 1997 WL 538921 (D.C.Super.Ct. Aug. 18, 1997)(memorandum opinion and order).
As noted in Reed v. Philip Morris, Inc., 1997 WL 538921 (D.C.Super.Ct. Aug. 18, 1997) which denied class certification to plaintiff smokers where the choice-of-law analysis applied was the "most significant relationship" test:
A class member may have started smoking, learned of the dangers of smoking, tried to quit, been diagnosed with a smoking-related illness, and/or changed brands, all in different states. Accordingly, this court would have to examine the laws of virtually every state, as it is conceivable, with the transient population of the District, that each of these *449 issues may have arisen in different states with different class members, to determine if a conflict exists and then determine which state has the most significant interest. The potential for conflicts of law mitigates against certification.
See also Smith v. Brown & Williamson, 174 F.R.D. at 95 (rejecting smokers' class limited to one state's residents in part because of manageability problems in applying the "most significant relationship" test); Tijerina v. Philip Morris Inc., 1996 WL 885617, at *5; Philip Morris v. Angeletti, 752 A.2d at 230-33 (rejecting smokers' class limited to Maryland residents in part because of manageability problems in applying simpler "lex loci delicti" test).
The choice-of-law analysis in the present case will require examination of numerous significantly different state laws governing the different plaintiffs' claims. This fact further supports our conclusion that common questions do not predominate over individual issues, and that the superiority and the management of this trial could not be fairly and efficiently conducted as a class action.
The plaintiffs' "negative value" argument in response to the above-cited and well-established line of authority does not justify improper class certification. The plaintiffs suggest certification must be maintained at any cost because otherwise individual plaintiffs will be left with no viable remedy, absent class certification. According to the plaintiffs, individual plaintiffs could not successfully litigate against the tobacco industry because lawyers will shun smokers' individual cases as "cost prohibitive and impractical."
This factor by itself is insufficient to overcome the hurdles of predominance and superiority, and efficient and fair management of a trial, which are required by our class action rules. The serious problems this type of class action suffers in terms of both efficiency and fairness cannot be resolved by characterizing individual smokers' claims as having a "negative value." To do so is not only intellectually improper, but also clearly refuted by the Phase 2 verdict, where the jury awarded $12 million dollars in compensatory damages to just three smokers on their individual claims.[15] The plaintiffs' "negative value" claim is baseless and does not "justify the headlong plunge into an unmanageable and interminable litigation process that, at the outset, shows little promise for fairness to either [plaintiffs] or the defendant manufacturers." Barreras Ruiz v. American Tobacco Co., 180 F.R.D. 194, 199 (D.P.R. 1998); accord Castano, 84 F.3d at 748; In re LifeUSA Holding, Inc., 242 F.3d 136, 148 n. 13 (3d Cir.2001).
In sum, particularly with regard to the determination of causation and damages, and where claims could require application of the laws of numerous other states, it is inescapable that the predominance and superiority requirements for class action have not been met. As succinctly stated by one commentator:
[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate.... Moreover, when individual rather than common issues predominate, the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified.
*450 7a Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1778 at 535-39 (2d ed.1986)(footnotes omitted).
As now demonstrated by the two-year trial, even though there is a common nucleus of facts concerning the defendants' conduct, this case presents a multitude of individualized issues which make it particularly unsuitable for class treatment. See State Farm Mut. Auto. Ins. Co. v. Kendrick, 822 So.2d 516, 518 (Fla. 3d DCA 2002); Humana, Inc. v. Castillo, 728 So.2d 261, 265-66 (Fla. 2d DCA 1999); see also In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1020 (7th Cir.2002) (reversing certification; differences in state law cannot be overridden based upon a quest to clear the queue in court); Stirman v. Exxon Corp., 280 F.3d 554, 564 (5th Cir.2002) (reversing certification because district court failed to take into account significant variations in state law that defeat predominance). A class action is not superior to alternative means of adjudication, and the record does not support the requisite findings under Florida Rule of Civil Procedure, Rule 1.220.
The trial record and recent case law conclusively establish that Florida's class action rules, substantive tort law, and state and federal guarantees of due process and a fair trial, require class decertification. In accordance with the numerous cases which have found class certification improper in virtually identical smokers' claims cases, we find the class must be decertified. Accordingly, the certification of the class is reversed, with instructions to decertify and to allow all class members whose claims have not yet been tried to proceed individually.

III. Punitive Damages: "The Cart Before Horse"

The order below must also be reversed because the trial court erred in awarding and ordering payment of class-wide punitive damages without the necessary findings of liability and compensatory damages. The order violates well-established Florida precedent by: a) improperly requiring the defendants to pay punitive damages for theoretical injuries to hundreds of thousands of class members, without a determination that defendants are liable for such injuries; b) precluding the constitutionally required comparison of punitive damages and compensatory damages; and c) eliminating the jury's discretion to assess punitive damages based upon the individual class members' varying circumstances.
In Phase 1, the jury answered certain general questions about the defendants' products and conduct. The questions related to some, but not all of the elements of each legal theory alleged. The jury also found that unspecified conduct by the defendants "rose to a level that would permit a potential award or entitlement to punitive damages."
The jury did not determine whether defendants were liable to anyone. Essential elements of liability, such as reliance and proximate cause, were never tried in Phase 1. Instead, they were left to be tried separately for each class member in Phase 2 or Phase 3.[16] Yet, regardless of how many of the assumed 700,000 or more class members actually proceed to try their *451 claims in Phase 3 and ultimately establish liability and compensatory damages, the defendants must pay $145 billion dollars in punitive damages.
Florida law requires that a defendant be found liable before any punishment is imposed. Accordingly, "[w]here actual damage is an element of the underlying cause of action, an award of compensatory damages must be a prerequisite to an award of punitive damages." Ault v. Lohr, 538 So.2d 454, 457 (Fla.1989)(Ehrlich, C.J. concurring); see also W.R. Grace & Co. v. Waters, 638 So.2d 502 (Fla.1994)(punitive damages in bifurcated trial may not be determined until after the jury has determined liability for compensatory damages and the amount of compensatory damages); Oliveira v. Ilion Taxi Aero Ltda, 830 So.2d 241 (Fla. 4th DCA 2002)(punitive damages award reversed because there was no finding of liability). Federal due process law incorporates the same principle. See Allison v. Citgo Petroleum Corp., 151 F.3d 402, 418 (5th Cir. 1998) (punitive damages "must be determined after proof of liability to individual plaintiffs"); Taber Partners I v. Merit Builders, Inc., 121 F.3d 695 (1st Cir.1997) (unpublished table decision) (a "firmly established legal rule is that a finding of liability must precede any finding of damages").[17]
Without this prior assessment it is impossible to determine whether punitive damages bear a "reasonable" relationship to the actual harm inflicted on the plaintiff, as required by Florida and federal law. See § 768.74(5)(d), Fla. Stat. (1997); Bankers Multiple Line Ins. Co. v. Farish, 464 So.2d 530, 533 (Fla.1985); Langmead v. Admiral Cruises, Inc., 696 So.2d 1189, 1193-94 (Fla. 3d DCA 1997) (under Florida and federal due process laws, a punitive award must be proportionate to the "actual harm inflicted on the plaintiff"); see also Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 441-42, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (courts must examine "the ratio between the size of the award of punitive damages and the harm caused"); BMW of North America, Inc. v. Gore, 517 U.S. 559, 580, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (due process requires consideration of the "ratio" of punitive damages "to the actual harm inflicted on the plaintiff").
Establishment of this reasonable relationship requires a prior determination of the compensatory damages caused by the alleged misconduct. See Op. Att'y Gen. Fla., 2000 WL 329587 (Fla.A.G.2000)("[i]n the absence of any determination of the extent of compensatory damages, the court lacks a standard by which it can judge whether an assessment of punitive damages is reasonable or is grossly excessive"). Without this prior determination, any comparison between a punitive award and the "actual harm" is impossible.
For this reason, federal and other state courts have repeatedly held that compensatory damages must be tried before punitive damages.[18]See Southwestern Ref. Co. *452 v. Bernal, 22 S.W.3d 425; see also, Allison, 151 F.3d at 418 (punitive damages in a multi-stage class action "must be determined after proof of liability to individual plaintiffs"); Smith v. Brown & Williamson Tobacco Corp., 174 F.R.D. 90, 97 (W.D.Mo.1997) (rejecting a trial plan that required the jury to assess class-wide punitive damages before assessing compensatory damages); Philip Morris, Inc. v. Angeletti, 358 Md. 689, 752 A.2d 200, 247 (2000)("Maryland law prohibit[s] an award of punitive damages made without regard to the actual compensatory damages to be awarded"); cf. EEOC v. W & O, Inc., 213 F.3d 600, 615 (11th Cir.2000)("Before comparing the punitive damages to the actual damages, we must first determine what the `actual damages' were").
In an apparent effort to sidestep this well-established authority, the plaintiffs argue Ault v. Lohr, 538 So.2d at 454, and W.R. Grace & Co. v. Waters, 638 So.2d at 502, have been complied with, contending that the Phase 1 verdict constitutes a finding that defendants "breached a duty." According to the plaintiffs, that finding alone is a sufficient predicate for a class-wide punitive awardeven though it is not a finding of liability. The plaintiffs have misread Ault.
In Ault, the jury found the defendant was liable for civil assault and battery, not just that he had "breached a duty." The jury then awarded punitive damages without awarding compensatory damages. The Florida Supreme Court held that even in the absence of compensatory damages, the punitive award was proper because it rested on the jury's "express finding of liability." Ault v. Lohr, 538 So.2d at 456.[19]
Plaintiffs' "breach of duty" theory ignores the essential finding of liability in Ault. A punitive award is proper only if the plaintiff proves every element of liability on the underlying cause of action. See Ault v. Lohr, 538 So.2d at 457 (Ehrlich, C.J., concurring).[20]See also, Nat'l Aircraft *453 Services, Inc. v. Aeroserv Int'l, Inc., 544 So.2d 1063, 1065 (Fla. 3d DCA 1989)(a fraud plaintiff who fails to obtain compensatory damages has not proved all the elements of fraud and thus may not obtain punitive damages).
Here, the plaintiffs sought punitive damages for fraud, concealment, and "intentional infliction of emotional distress." Liability for each of those causes of action requires much more than just a "breach of duty." Each requires actual injury, compensatory damages, and other liability elements as well.[21] Thus regardless of whether the Phase 1 verdict constituted a finding that defendants "breached a duty," such a finding is an insufficient predicate for the punitive award because it fails to establish actual injury and compensatory damages, plus other elements of liability, as to any of the individual class members.
The plaintiffs' alternatively argue Ault has been satisfied claiming the Phase 1 verdict actually did establish the defendants' "liability" to each class member. This argument is similarly meritless. The mere finding that smoking causes certain diseases does not establish the causation elements of liability.
Specific medical causation and legal causation, along with other elements of liability, must be established on an individualized basis. As noted by one court, "a finding of `general causation' would do little to advance this [smokers class] litigation. Liability will not turn on whether cigarettes are generally capable of causing disease; liability will depend upon whether cigarettes caused a particular plaintiff's disease." See Smith v. Brown & Williamson Tobacco Corp., 174 F.R.D. at 96. No findings of specific medical and legal causation were made in the plaintiff-less Phase 1 trial.[22]
Finally, the plaintiffs attempt to satisfy Ault by claiming the Phase 2 verdict as to the three individual class representatives established the defendants' liability to all class members, and hence awarding punitive damages to the entire class is appropriate. This argument is also fundamentally flawed.
The defendants are entitled to a jury determination, on an individualized basis, as to whether and to what extent each particular class member is entitled to receive punitive damages. One class member's circumstances cannot serve as a proxy for another's.[23]See, e.g., In re Copley *454 Pharm., Inc., 161 F.R.D. 456, 467 (D.Wyo.1995) (rejecting proposal to try punitive liability as a class-wide issue because punitive damages are measured, in part, by the outrageousness of the conduct relative to a particular plaintiff); see also, Reap v. Cont'l Cas. Co., 199 F.R.D. 536, 549 (D.N.J.2001) (denying class certification because, among other things, calculating compensatory and punitive damages *455 would be an individualized task); Adams v. Henderson, 197 F.R.D. 162, 172 (D.Md. 2000) (denying class certification due to, among other things, the fact that individualized damages inquiries would inevitably by required for the compensatory and punitive damages claims).
This Court specifically recognized in its 1996 mandate that "the issue of damages" in this case must "be tried as to each class member." Engle, 672 So.2d at 41. Our ruling made no distinction between compensatory and punitive damages.
The award below directly violates this Court's mandate because it allows the trial of three individuals' claims to establish entitlement to punitive damages with respect to the entire class. Our mandate was in accord with settled Florida law which provides that, "awarding punitive damages along with compensatory damages [is] discretionary [with the jury], even if the elements authorizing punitive damages [are] present." Bankers Multiple Line Ins., 464 So.2d at 532; see also, Owens-Corning Fiberglas Corp. v. Ballard, 749 So.2d 483, 486-87 (Fla.1999); Wackenhut Corp. v. Canty, 359 So.2d 430, 436 (Fla.1978); Humana Health Ins. Co. v. Chipps, 802 So.2d 492 (Fla. 4th DCA 2001); 1 J. Kircher & C. Wiseman, Punitive Damages: Law & Practice § 5: 23, at 5-152 (2d ed.2000) ("the jury, in its discretion, may withhold [punitive] damages in the face of overwhelming proof of the requisite egregious conduct on the part of the defendant").
Yet the plaintiffs suggest that it was proper for the trial court to "extrapolate" the class representatives' damages to the rest of the class during the punitive damages phase of the trial. Extrapolation is not theoretically permissible in this case because of the absence of essential information concerning actual class size, class composition, and the amounts of compensatory damages ultimately recoverable by class members.[24] Essentially, the compensatory damages awarded to the three Phase 2 plaintiffs proved nothing about the amounts of compensatory damages potentially recoverable by the hundreds of thousands of class members whose claims have not yet been tried. See Smith v. Texaco, 263 F.3d at 410 (where injuries are not uniform among class members, "an individualized inquiry is necessary" as to punitive damages); Cimino v. Raymark Indus., Inc., 151 F.3d 297, 319 (5th Cir.1998); In re Fibreboard Corp., 893 F.2d 706, 710-12 (5th Cir.1990); In re Tetracycline Cases, 107 F.R.D. 719, 734-35 (W.D.Mo.1985).[25]
*456 The plaintiffs' arguments in this regard contradict settled Florida law and basic concepts of due process. A claim for punitive damages is not a separate and distinct cause of action; rather it is auxiliary to, and dependent upon, the existence of an underlying claim. As such, any award of punitive damages can only be entered after awarding damages in conjunction with an underlying and successful claim for actual damages. See State Farm Mutual Automobile Ins. Co. v. Campbell, ___ U.S. ___, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)(punitive award must be limited to unlawful conduct that has a nexus to the "specific harm suffered by the plaintiff"; punitive award must be based upon facts and circumstances of the defendant's conduct and "the harm to the plaintiff"; courts must ensure punitive award is "proportionate to the amount of harm to the plaintiff").[26]
The trial plan in the instant case required the defendants to pay punitive damages for supposed injuries to thousands of class members without the necessary prerequisite findings of liability and compensatory damages. Since the class-wide punitive damages award improperly places the proverbial "cart before the horse," it must be reversed.

IV. Punitive Award Excessive Under State and Federal Law

It is well established that punitive damages may not be assessed in an amount which will financially destroy or bankrupt a defendant. See Arab Termite & Pest Control of Florida, Inc. v. Jenkins, 409 So.2d 1039, 1043 (Fla.1982); Lipsig v. Ramlawi, 760 So.2d 170, 188 (Fla. 3d DCA 2000), review denied, 786 So.2d 579 (Fla. 2001); Brooks v. Rios, 707 So.2d 374, 375 (Fla. 3d DCA 1998); Hockensmith v. Waxler, 524 So.2d 714, 715 (Fla. 2d DCA 1988).[27] And yet, that is precisely what occurred in the instant case.
This trial produced the largest punitive damage verdict in American legal history. As acknowledged by even the plaintiffs' purported experts, the $145 billion punitive award will extract all value from the defendants and put them out of business, in violation of established Florida law that prohibits bankrupting punitive awards.
The defendants established that their combined net worth was no *457 more than $8.3 billion.[28] Their collective capacity to pay any punitive award while still remaining in business was far less. The $145 billion verdict is roughly 18 times the defendants' proven net worth.[29]
There is no precedential authority for such an award. No Florida decision endorses even a remotely comparable award. The largest reported awards involved only a fraction of a defendant's net worth. See Wackenhut Corp. v. Canty, 359 So.2d 430 (Fla.1978) (2%); Bould v. Touchette, 349 So.2d 1181 (Fla.1977) (6.2%); Zambrano v. Devanesan, 484 So.2d 603 (Fla. 4th DCA 1986) (14.29%); Smith v. Telophase Nat'l Cremation Soc'y, Inc., 471 So.2d 163 (Fla. 2d DCA 1985) (20%); see also People ex rel. Dep't of Transp. v. Grocers Wholesale Co., 214 Cal.App.3d 498, 262 Cal.Rptr. 689, 699-700 (1989) (noting that while 10% is the maximum for punitive damage awards, significantly lower percentages are generally the norm). No case has awarded punitive damages based upon multiples of net worth, as was done in the present case.
*458 A defendant's financial capacity is a crucial factor in determining the appropriateness of a punitive damages award. The amount awarded should be large enough to provide retribution and deterrence, but cannot be so great as to result in bankruptcy.[30] Punitive damages are imposed to benefit society's interests. Because society has an interest in protecting future claimants' demands, the importance of the relationship between the amount of punitive damages and the ability of the defendant to pay the award cannot be ignored.
The excessive award in the present case will frustrate the societal interest in protecting all injured claimants' rights to at least recover compensatory damages for their smoking related injuries. Smokers with viable compensable claims will have no remedy if the bankrupting punitive award in the instant case is upheld.
For the several reasons stated above, we find the trial court abused its discretion when it denied the defendants' motion for either a remittitur or a new trial. This unprecedented punitive damages award is excessive as a matter of law, and thus does not promote a valid societal interest. See State Farm Mutual Automobile Ins. Co. v. Campbell, ___ U.S. ___, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)(punitive award of $145 million on a $1 million compensatory judgment held excessive; award exceeding single-digit ratio between punitive and compensatory damages presumptively violates due process.)[31] As discussed further below, the bankrupting punitive award resulted from inflamed juror passion and prejudice which blinded the jury from properly considering the purpose of the award in relation to the defendants' financial capacity.

V. Inflammatory Arguments Mandate Reversal

Plaintiffs' counsel's improper race-based appeals for nullification caused irreparable prejudice and require reversal. It is obvious that the "runaway" jury award was largely the result of numerous improper comments by plaintiffs' counsel directing the jury to disregard limitations on punitive damages. The trial was book-ended with prejudicial attorney misconduct which incited the jury to disregard the law because the defendants are tobacco companies.[32]
*459 This was accomplished in two stages. First, by inflaming the jury with racial pandering and pleas for nullification of the law to secure entitlement to punitive damages. And second, by removing responsibility from the jury for the size of the award, through arguing the award would be subject to appellate review and that it would not be paid out in a lump sum, but rather through a payout scheme.
Plaintiffs' counsel began making racially-charged arguments on the first day of trial. This was done before a jury where four of the six venire members were African-American. In opening statements during the Phase 1 trial, plaintiffs' counsel told the jury that the defendants "study races" and "divide the American consumer up into groups," including "white" and "black."[33] Plaintiffs' counsel then explicitly tied these racial references to appeals for jury nullification of the law during closing argument. He set the stage by telling the jury: "And let's tell the truth about the law, before we all get teary-eyed about the law. Historically, the law has been used as an instrument of oppression and exploitation." Plaintiffs' counsel then juxtaposed defendants' conduct with genocide and slavery.[34] Although the trial court sustained a defense objection, plaintiffs' counsel proceeded to tell the jury that, like slavery and the Holocaust, there was just one "side" to whether the defendants should continue to sell cigarettes:

*460 If you admit that you sell a product that causes cancerI admit my product causes cancerand if you also admit it's also addictive, get out of the business. That's the only moral, ethical, religious, decent judgment to make.... If you sell a product which causes cancer and which is addictive, stop selling it. Stop selling it, because you know it's doing unbelievable harm to your fellow Americans.
The defendants' objection was overruled, allowing plaintiffs' counsel to conclude: "[The defendants say] [i]t's a legal product. It's a legal product. Legal don't make it right. Legal don't make it right."
For more than sixty years, federal statutes have protected the right to sell cigarettes, even though Congress has recognized that cigarettes are dangerous. Federal law preempts claims that selling cigarettes is tortious or otherwise improper. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000); Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001).[35] A defendant cannot be punished for lawful conduct. See State Farm, 123 S.Ct. at 1522.
Yet counsel repeatedly urged the jury to fight what he called "unjust laws" citing the civil disobedience of Martin Luther King and Rosa Parks.[36] Counsel compared the defendants' reliance on the laws which provided it is lawful to market and *461 sell cigarettes, to positions taken by defenders of slavery and of the holocaust. He compared the jurors task, to the fight against segregation, invoking Rosa Parks, Dr. King, and, as he put it, the whole civil rights movement of the 60's, as a fight against unjust laws. He then tied this period in the past directly to the defendants, by telling the jury to stand up to the defendants' lawful conduct in marketing and selling cigarettes.
At the end of plaintiffs' first day of closing, defendants renewed their request for a mistrial, citing a variety of improper arguments including the statements quoted above. With reference to those statements, plaintiffs' counsel admitted that he had asked the jury to disregard the law, just as Dr. King and Rosa Parks had disregarded laws that were later "recognized as wrong":
I submit that in a case where one of their strongest legal defenses is that: We make a legal product, it is a legal product, that it is perfectly acceptable for me to analogize about all the things in this country historically which have been legal but have been recognized as wrong in future years.
The court deferred ruling on defendants' mistrial motion but warned plaintiffs' counsel that he was proceeding at his own peril and that plaintiffs' counsel should consider "the possible [e]ffect it may have on any appellate court." The court told plaintiffs' counsel: "[What] you shouldn't do in front of the jury is pander.... Shouldn't pander [to] the jury." Nonetheless, the court refused to grant a mistrial because of the length of the trial proceedings that had already occurred stating:
We've been here 10, 11 months. In this one final argument day, which is the first day, there has been at least two, maybe even three motions for mistrials. It just seems to me that it would be foolish to put ourselves in that position because of whatever reason, whatever behavior, whatever was said, to lose this opportunity to get this case resolved. It's an unusual case.... And to throw it away at the last minute, after 10, 11 months, because of some comment made or something that's unforeseen that happens during closing argument, to me, is ludicrous. And I'm concerned. I really am. I don't think any of us really want it, even though motions have been made. I don't think we really want that to happen.
Florida courts uniformly condemn the type of pandering which occurred in this case as inflammatory and prejudicial. See Murphy v. Int'l Robotic Systems, Inc., 766 So.2d 1010 (Fla.2000); Johnnides v. Amoco Oil Co., 778 So.2d 443, 444-45 (Fla. 3d DCA 2001). Nullification arguments have absolutely no place in a trial and violate state and federal due process by exposing defendants to liability and punishment based upon lawful conduct. Urbin v. State, 714 So.2d 411, 420 (Fla.1998); see also Harding v. State, 736 So.2d 1230 (Fla. 2d DCA), review denied, 744 So.2d 454 (1999)(defense may not argue jury nullification); United States v. Trujillo, 714 F.2d 102, 106 (jury nullification argument would improperly encourage jurors to violate their oath and apply the law at their own caprice).
The prejudicial impact of the nullification arguments was further compounded by counsel's racially charged statements. These statements were made to a predominantly African-American jury panel and were clearly directed toward persuading the jury to nullify the law.[37] As *462 this Court has previously emphasized: "It is, of course, highly improper to interject even a reference to, let alone an accusation of racism which is neither justified by the evidence nor relevant to the issues into any part of our judicial system." Perez v. State, 689 So.2d 306, 307 (Fla. 3d DCA 1997) (reversal required where a prosecutor characterized defendants as engaging in conduct that was "divided along racial lines"); see Wallace v. State, 768 So.2d 1247, 1250-51 (Fla. 1st DCA 2000) ("Our system of justice cannot tolerate an attempt to exploit these feelings of racial prejudice to the extent that they may exist among those who serve on juries."); F.J.W. Enterprises, Inc. v. Johnson, 746 So.2d 1145, 1147 (Fla. 5th DCA 1999); Terrazas v. State, 696 So.2d 1309, 1310 (Fla. 2d DCA 1997); Reynolds v. State, 580 So.2d 254, 256 (Fla. 1st DCA 1991); see also Bird, 255 F.3d at 1150-51 (due process in a civil trial was violated by plaintiffs' reference in closing argument to "white racism in exploitation of Indians," where Indians sat on the jury); see also Gen. Motors Acceptance Corp. v. Baymon, 732 So.2d 262, 271-72 (Miss.1999) (plaintiffs' counsel played the race card by making inflammatory racial arguments to the jury, including assertions that defendant's conduct victimized primarily African-Americans and the poor).
An appeal to race so fundamentally damages the fairness of a trial, that even in the absence of an objection, a new trial is required in order to maintain the public trust in our system of justice. See Murphy v. Int'l Robotic, 766 So.2d at 1030; see Robinson v. State, 520 So.2d 1 (Fla. 1988). Here, plaintiffs' counsel repeatedly violated this rule and thus a new trial would be required even if no objection had been made.
However, the fact remains that the defendants did object repeatedly, and, although the court sustained some of the objections, it could not unring the bell.[38]See Williams v. State, 715 So.2d 1152, 1153 (Fla. 3d DCA 1998)(reversal required even *463 though objections to counsel's improper statements were sustained, because "[t]he die was castthe damage was done"); Muhammad v. Toys "R" Us, Inc., 668 So.2d 254, 258-59 (Fla. 1st DCA 1996)(collective import of counsel's improper arguments required a new trial even though some objections were sustained); Walt Disney World Co. v. Blalock, 640 So.2d 1156, 1158 n. 1 (Fla. 5th DCA 1994)("You can throw a skunk into the jury box and instruct the jurors not to smell it, but it doesn't do any good."); see also O'Rear v. Fruehauf Corp., 554 F.2d 1304, 1309 (5th Cir.1977) (noting cautionary instructions are effective only up to a certain point; judges must realize that after repeated exposure of a jury to prejudicial information, "cautionary instructions will have little, if any, effect in eliminating the prejudicial harm").
Similarly egregious, plaintiffs' counsel repeatedly made legally improper arguments to the jury regarding the payment of any award, and personally vouched to the jury that the defendants would not go bankrupt. The prejudice caused by these statements is significant. By suggesting a large award would not bankrupt the defendants and that payments could be made in installments, plaintiffs' counsel ensured there would be no realistic check on the jury entering a bankrupting award.
This is clearly improper. A defendant's ability to pay a punitive award is to be measured as of the time of trial. Net worth cannot be based upon speculation regarding the defendant's future ability to pay. See Cash v. Beltmann North American Co., 900 F.2d 109, 111 n. 3 (7th Cir.1990) (proper measure is net worth at time of trial); Zhadan v. Downtown L.A. Motor Distrib., Inc., 100 Cal.App.3d 821, 161 Cal.Rptr. 225, 236 (1979) (same); Fopay v. Noveroske, 31 Ill.App.3d 182, 334 N.E.2d 79, 94 (1975) (jury may not base punitive damages on prediction of defendant's future earnings); Bienvenu v. Dudley, 682 So.2d 281, 285 (La.Ct.App.1996) (only "current" financial condition is relevant in determining appropriateness of exemplary damages); Welty v. Heggy, 145 Wis.2d 828, 429 N.W.2d 546, 549 (1988) (usual measure of wealth is net worth at the date of trial); see also Brooks, 707 So.2d at 376 (affirming punitive award where defendant failed to present evidence sufficient to establish his net worth at the time of trial as a basis for comparison); Bould, 349 So.2d at 1181 (reviewing punitive award in comparison with defendant's net worth at the time of trial).[39]
Yet, plaintiffs counsel repeatedly violated this rule by urging the jury to assume *464 any award would be payable in installments over decades into the future. The improper comments started during opening statements in Phase 2, when plaintiffs' counsel made an improper speaking objection in the presence of the jury stating:
"That can happen in this case. There can be a payout."
During direct examination of his own witness, plaintiffs' counsel asked how much the defendants could afford to pay without going out of business:
"if they had the right to pay out the money over an extended period of time?"
And during cross-examination of defendant Liggett's CEO, plaintiffs' counsel asked:
"You wouldn't go out of business if there was a payout arrangement?"
Continuing this theme through to closing argument, plaintiffs' counsel urged the jury to base its award on a $118 billion dollar "difference" between what the defendants supposedly offered to pay under a proposed (but never implemented) national settlement"368 billion" over twenty-five yearsand what the defendants did agree to pay in actual settlements with States"250 billion" over twenty-five years. Settlements based upon twenty-five year payouts have no bearing on the defendants' current ability to pay.[40] Contrary to plaintiffs' counsels representations, the defendants were ordered to pay the $145 billion dollar award immediately into the court registry. Clearly the references to "payouts" were designed solely to mislead the jury and inflate the punitive award.
After numerous defense objections, the court held plaintiffs' counsel in contempt for continuing to make statements referencing extended payouts.[41] However, while acknowledging the impropriety of counsel's conduct, the court denied the defendants' request for a mistrial.[42]
The misconduct continued, as plaintiffs' counsel referred to matters outside the evidence, made derogatory personal remarks about opposing counsel, and expressed his personal opinion to the jury. Plaintiffs' counsel maligned a defense attorney by name, calling the attorney's argument to the jury "a fraud." He expressed his personal opinions about the merits of the case stating the defendants' position made him grit his teeth and say to himself: "Can anyone buy this?"
Plaintiffs' counsel further repeatedly expressed his personal opinions about the defendants' witnesses, making such comments as: "I wanted to punch" one witness; that another witness "wouldn't know science if he fell on science"; that he was sure another witness "was ashamed to give *465 this answer, but he gave it ... under oath"; and that as to another witness, "I figured, well, this guy hasn't been prepped on the subject [by counsel], so maybe I'll get an honest answer". He told the jury the defendants' CEO witnesses lied to him under oath during their depositions, and that defendants had engaged in the "longest running con in the history of the world," and "our kids and grandchildren" will ask "how did you let them get away with it?"
This Court has expressly condemned all of the categories of misconduct plaintiffs' counsel engaged in here. See, e.g., Johnnides, 778 So.2d at 444 (attacks on integrity of counsel are both contemptible and condemnable); Owens-Corning Fiberglas Corp. v. Crane, 683 So.2d 552, 554-55 (Fla. 3d DCA 1996) (reversal required by derogatory comments concerning opposing counsel; "it is never acceptable for one attorney to effectively impugn the integrity or credibility of opposing counsel before the jury"); Carnival Cruise Lines, Inc. v. Rosania, 546 So.2d 736, 737 n. 1 (Fla. 3d DCA 1989) (new trial required because plaintiffs' counsel made disparaging remarks about the defendant).
We have also held that it is improper for counsel to express personal opinions about a case or comment on matters not in evidence. See Cohen v. Pollack, 674 So.2d 805, 806-07 (Fla. 3d DCA 1996) (an attorney's personal beliefs or feelings about the case are irrelevant and constitute reversible error); R. Regulating Fla. Bar 4-3.4(e) (a lawyer shall not allude to any matter "that will not be supported by admissible evidence"); see generally Ruiz v. State, 743 So.2d 1, 4 (Fla.1999) (the "role of counsel in closing argument is to assist the jury in analyzing [the] evidence, not to obscure the jury's view with personal opinion, emotion and non record evidence").[43]
Again, even though the court sustained objections to some of counsel's statements, as noted previously, the prejudicial effect was incurable.[44]See Williams v. State, 715 So.2d at 1153 ("The die was cast-the damage was done"); Muhammad, 668 So.2d at 258-59; Walt Disney, 640 So.2d at 1158 n. 1. See, e.g., Maercks, 549 So.2d at 200 ("[w]hether we consider only the remarks as to which the objections were overruled, or the closing argument as a whole, there must be a new trial."); Del Monte Banana Co. v. Chacon, 466 So.2d 1167, 1175 (Fla. 3d DCA 1985) (the "cumulative *466 impact of plaintiff's counsel's complained-of actions at trial clearly mandates reversal").
Enforcement of the settled prohibitions against this type of prejudicial misconduct was especially important in the context of this massive class action against a highly unpopular industry. The cumulative and inherent inflammatory impact of these arguments and conduct is clearly reflected by the verdict. Plaintiffs' counsel succeeded in inflaming the jury's passions as evidenced by the astronomical, bankrupting award.[45] In sum, the improper comments of plaintiffs' counsel further deprived the defendants of due process and a fair trial, thus additionally requiring reversal.

VI. Liggett: Proof of a "Runaway Jury"

The punitive award against defendant Liggett is not supported by the evidence and demonstrates the jury was irreparably prejudiced in entering the grossly excessive $145 billion dollar award. The Phase 1 verdict found all defendants liable, including defendant Liggett Group, Inc. and defendant Brooke Group Holding, Inc. (hereafter collectively referred to as "Liggett/Brooke"). However, in the first part of Phase 2, the jury allocated zero fault to Liggett with respect to the non-punitive counts. Liggett/Brooke's motion to set aside the verdict as inconsistent was denied, and it was held jointly and severally liable for 100% of the compensatory damages award to each of the three named plaintiffs.
Yet, there was no evidence Liggett/Brooke had any knowledge about the health effects of smoking prior to this time. Liggett/Brooke was the only company that did not ammoniate the cigarettes it sold. Liggett/Brooke did not participate in the 1950's industry strategy meetings, did not sign or endorse the Frank statement, and was not involved in the creation of the Tobacco Industry Research Committee. Significantly, none of the class representatives purchased or smoked Liggett/Brooke cigarettes.
The verdict as to Liggett/Brooke must be reversed. Not only was there manifestly insufficient evidence to support the judgments in favor of the three named plaintiffs,[46] there was likewise no evidence to support any punitive award, let alone an *467 award that will destroy Liggett/Brooke many times over.[47] The patent impropriety of the verdict against Liggett/Brooke demonstrates the prejudicial impact of the errors at trial which, combined with the improper conduct of counsel and the trial plan, compels reversal as to all the defendants.
Despite the fact that not one of the three plaintiffs ever used a Liggett/Brooke product, the jury was obviously swept along in lemming-like fashion to find all the defendants responsible because they participated in the tobacco industry. This is not the law. Mere participation in the tobacco industry does not destine a corporation to legal suicide upon the shores of bankruptcy.
Here, judgment was entered against Liggett/Brooke for medical claims for smoking cigarettes that Liggett/Brooke did not make. The only explanation for this clearly improper verdict against a company whose cigarettes none of these plaintiffs ever used, is that the integrity of the entire trial was compromised as a result of the trial errors and improper conduct of counsel.[48]
Clearly there is no basis for the claims against Liggett/Brooke. The jury "ran amuck." Since there is no distinction between the claims as to the other defendants, which were all tried together and which were all subject to the same arguments and techniques, the tainted jury verdict requires that the entire case be reversed.

VII. The Punitive Damage Claims Are Barred

The punitive award is precluded by the settlement agreements which resolved all claims asserted by the states, as well as the final judgment resolving the state of Florida's suit against the tobacco industry, which expressly included claims for punitive damages.
In Florida v. American Tobacco Co., No. 95-1446 AH (Fla. 15th Jud.Cir.1995), the State of Florida sued the same defendants for fraud, conspiracy, and the sale of a defective and "addictive" product, asserting punitive-damage and other claims. Florida's allegations of misconduct were the same as those in the present case.
Other states around the country brought similar suits against the tobacco industry. The states settled all of their cases in 1997 and 1998. Separate agreements covered Florida and three other states. Florida *468 settled and released its claims in 1997, by entering into the Florida Settlement Agreement ("FSA"), which resolved with finality all of Florida's claims, "including those for punitive damages."
A multistate agreement (the Master Settlement Agreement or "MSA") covered the remaining forty-six states. Under these agreements, defendants are obligated to pay the states more than $200 billion dollars (subject to specified adjustments) over the first twenty-five years, and to pay the states billions more in perpetuity after that.
Based upon these agreements, the defendants moved to preclude any punitive award asserting all punitive damage claims against the tobacco industry had been settled in the lawsuit brought by the State of Florida. The trial court denied the motions. Since application of res judicata is a question of law, our standard of review on this issue is de novo. See, e.g., In re Piper Aircraft Corp., 244 F.3d 1289, 1295 (11th Cir.2001) ("A court's application of res judicata presents questions of law reviewed de novo"), cert. denied, 534 U.S. 827, 122 S.Ct. 66, 151 L.Ed.2d 33 (2001).
In Young v. Miami Beach Improvement Co., 46 So.2d 26 (Fla.1950), the Florida Supreme Court held that a judgment in a suit involving a municipal corporation which resolved "a matter of general interest to all its citizens" was binding upon all citizens even though they were not parties to the suit. The court reasoned that each citizen "is a real, although not a nominal, party to such judgment, and cannot relitigate any of the questions which were litigated in the original action." Young v. Miami Beach Improvement Co., 46 So.2d at 30. Thus, once a government agency resolves a matter of public rights or interests, the same matter cannot thereafter be relitigated by private parties.
Similarly, in Castro v. Sun Bank of Bal Harbour, N.A., 370 So.2d 392 (Fla. 3d DCA 1979), this Court held that private parties were barred from re-litigating certain public-nuisance and zoning claims already settled by the state. The settlement was binding on private parties regardless of whether they were formal parties to the original action, because they were "citizens of the State of Florida and the City of Miami at the time of the litigation." The same rule applies here.
The claims for punitive damages in the Florida v. American Tobacco Co. case and in this action are based on the same alleged facts. The punitive-damage claims in both cases addressed the same alleged misconduct and the same public interest. The plaintiffs, as private parties, do not have a "right" to punitive damages; punitive damages are awarded solely as a matter of public rights or interests, in order to serve the public policy of punishment and deterrence. See, e.g., Gordon v. State, 585 So.2d 1033, 1035-36 (Fla. 3d DCA 1991) (punitive damages "serve as punishment for what amounts to a public wrong"; private plaintiffs have "no cognizable, protectable right to the recovery of punitive damages at all"), aff'd, 608 So.2d 800 (Fla.1992); see also Chrysler Corp. v. Wolmer, 499 So.2d 823 (Fla.1986)(punitive damages are imposed for egregious conduct that constitutes a public wrong); Ingram v. Pettit, 340 So.2d 922 (Fla. 1976)(same). Accordingly, as a matter of law, Florida's settlement and release, and the res judicata effect of the resulting final judgment, preclude the plaintiffs' punitive-damage claims here.
Having improperly allowed the punitive damages claim to proceed, the trial court committed further reversible error by instructing the jury not to consider the FSA and MSA with regard to the issue of punishment and deterrence. By *469 the time the Phase 2 trial began, defendants had already paid over $14 billion dollars to the states, including $1.7 billion dollars to Florida. Enormous financial obligations were imposed by the settlements that resolved all of the states' claims, including claims for punitive damages. Additionally, the FSA and MSA impose sweeping deterrent measures on defendants' future conduct, which included prohibitions on advertising and other activities that could not be constitutionally imposed absent the defendants' agreement.[49]
However, over the defendants' objection, the court instructed the jury:
I hereby instruct you that the Florida Settlement Agreement and the Master Settlement Agreement do not constitute punishment of or deterrence to these defendants. You may consider evidence as to the Florida Settlement Agreement and the Master Settlement Agreement solely on the basis of the defendants' financial resources and obligations and changed conduct.[50]
Punishment and deterrence are the only legitimate objectives for a punitive damages award. The FSA and MSA clearly qualify as evidence relevant to punishment and deterrence. The defendants were entitled to have the jury consider the FSA and MSA as potential mitigating factors in determining the need for further punishment and deterrence, especially with regard to claims for the same alleged misconduct. See Owens-Corning Fiberglas Corp. v. Ballard, 749 So.2d at 487; Johns-Manville Sales Corp. v. Janssens, 463 So.2d 242 (Fla. 1st DCA 1984); St. Regis Paper Co. v. Watson, 428 So.2d 243 (Fla. 1983); see also Humana Health Ins. Co. of Florida, Inc. v. Chipps, 802 So.2d 492 (Fla. 4th DCA 2001)("jury should have been allowed to consider any [potentially mitigating] evidence"); Bankers Multiple Line Ins., 464 So.2d at 533 (parties should be permitted to present all evidence relevant to damages issues); Nordyne, Inc. v. Florida Mobile Home Supply, Inc., 625 So.2d 1283 (Fla. 1st DCA 1993)(same); Fla. Std. Jury Instr. (Civ.) PD1(b)(2).
Although a trial court generally has broad discretion in formulating jury instructions, a defendant is entitled to have the jury instructed "on the law applicable to the issues raised by the evidence." *470 Klipper v. Gov't Employees Ins. Co., 622 So.2d 1141, 1143 (Fla. 2d DCA 1993). The trial court erred in providing the jury with an instruction that removed a disputed issue from the jury's consideration. See South Motor Co. of Dade County v. Accountable Constr. Co., 707 So.2d at 912.
This error effectively precluded the defendants from presenting crucial mitigation evidence in the form of the FSA and MSA to support the argument that they had already received heavy financial obligations and binding deterrent measures for precisely the same conduct. The resulting prejudice is clearly evidenced by the astronomically excessive punitive damages award, and further exemplifies why reversal is required.

VIII. Conclusion: Awarding the GNP of Several European Countries

Is Error
In conclusion, the entire judgment must be reversed and the class decertified. The class fails the requirements of predominance and superiority. Any initially imagined savings of judicial resources and expense, have been dispelled by the ensuing litigation and the overwhelming procedural problems inherent in the certification of this type of smokers' litigation. Those class members whose claims have not yet been tried, should be allowed to proceed individually.
Class certification in mass tort actions such as this has been historically disfavored by courts throughout the nation. This hesitancy to certify complex mass tort actions is based upon the evolving recognition that the class action mechanism is generally not superior for these types of cases, and results in a higher than normal risk of infringing upon the rights of defendants.[51]
The present case presents a classic example of the inherent dangers that arise when a complex mass tort action is improperly certified. As discussed throughout this opinion, there are multiple sound legal bases why the result of this class action trial, including the punitive damages award, cannot be sustained.
The trial plan which produced the $145 billion dollar award, violates Florida law, violates this Court's 1996 certification decision, and is unconstitutional. The proceedings that produced the findings of entitlement and the $145 billion dollar award were irretrievably tainted by class counsel's misconduct, and the award is bankrupting under Florida law. The fate of an entire industry and of close to a million Florida residents, cannot rest upon such a fundamentally unfair proceeding. Our system of justice requires more. Accordingly, we reverse the judgment below with instructions to decertify the class.
Reversed and remanded with instructions to decertify the class.
NOTES
[1] The defendant cigarette companies are: Philip Morris Incorporated ("Philip Morris"); R.J. Reynolds Tobacco Company ("Reynolds"); Brown & Williamson Tobacco Corporation, individually and as successor by merger to The American Tobacco Company ("Brown & Williamson" or "B & W"); Lorillard Tobacco Company and Lorillard, Incorporated (collectively, "Lorillard"); and Liggett Group Incorporated and Brooke Group Holding Incorporated (collectively, "Liggett"). The defendant industry organizations are The Council for Tobacco Research-U.S.A., Incorporated ("CTR") and The Tobacco Institute, Incorporated ("TI").
[2] The trial court subsequently made changes in the plan, both before and during the trial. A major change in the plan concerned the method of assessing punitive damages. The original plan provided that in Phase 1, after trying certain "common issues," the jury would determine the potential entitlement of subclasses to punitive damages and then determine a "basis or ratio" for computing punitive damages individually for each class member within each subclass. In Phase 2, the jury would determine the individual liability and compensatory-damage claims of each named plaintiff, and then the punitive "basis or ratio" would be applied to each plaintiff's compensatory award (if any) to determine his or her punitive award. However, after the jury returned its Phase 1 verdict, and before the Phase 2 trial began, the court abandoned the "basis or ratio" method. Instead the court determined the jury would assess punitive damages as a lump sum with respect to the entire class. No allocation would be made of that amount to any of the named plaintiffs, nor to any particular class member. The defendants objected to the original and to subsequent versions of the plan.
[3] In its Omnibus Order, the court granted judgment in the defendants' favor in two respects. First, it ruled that the claims of named plaintiff Mr. Amodeo were time-barred with respect to strict liability, negligence, breach of warranty, and intentional infliction of emotional distress. However, it ruled that Mr. Amodeo's fraud and conspiracy claims were not time barred. Second, the court granted judgment for the defendants on the plaintiffs' claim for equitable relief, pursuant to a prior dismissal of that claim.
[4] The plaintiffs' "law of the case" argument in response to the decertification issues raised in this appeal clearly lacks merit in light of this Court's March 6, 1998 order expressly stating: "Appellants/petitioners may however, review the propriety of the order [denying decertification] by plenary appeal from any adverse final judgment." The "law of the case" doctrine, in any event, has only limited application to class-certification decisions. Such decisions remain conditional and subject to reconsideration until the case is finally resolved. See Fla. R. Civ. P., Rule 1.220(d)(1) (class certification order may be altered or amended any time before entry of judgment on the merits); see also, Toledo v. Hillsborough County Hosp. Auth., 747 So.2d 958, 960 (Fla. 2d DCA 1999)(rejecting "law of the case" challenge to trial court's decision to decertify, even though the appellate court had previously affirmed the initial class certification); Hebert v. Monsanto Co., 682 F.2d 1111, 1132 (5th Cir.1982) (law of the case is inapplicable to Federal Rule 23); Zenith Laboratories, Inc. v. Carter-Wallace, Inc., 530 F.2d 508, 512 (3d Cir.1976) (same). Even the trial court acknowledged that this Court's prior approval of class certification was "preliminar[y]," and this Court has specifically noted that "law of the case is inapplicable if there is even an arguable change in the substantive evidence presented." Metro. Dade County v. Martino, 710 So.2d 20, 22 (Fla. 3d DCA 1998); see City of Miami v. Bell, 606 So.2d 1183, 1185 (Fla. 1st DCA 1992)(the "law of the case" doctrine was "not meant to create vested rights in decisions that have become obsolete or erroneous with time"), quashed in part, 634 So.2d 163 (Fla.1994). The "law of the case" doctrine clearly does not foreclose decertification.
[5] We note further that since Florida's class action provision, Florida Rule of Civil Procedure 1.220, is based upon Federal Rule of Civil Procedure 23, federal precedents are persuasive authority in our construction of Florida's class action rules. See Concerned Class Members v. Sailfish Point, Inc., 704 So.2d 200, 201 (Fla. 4th DCA 1998).
[6] Rule 1.220, sets forth the prerequisites for class certification and reads in pertinent part:

"(a) Prerequisites to Class Representation. Before any claim ... may be maintained on behalf of a class by one party or more suing... as the representative of all the members of a class, the court shall first conclude that (1) the members of the class are so numerous that separate joinder of each member is impracticable, (2) the claim ... of the representative party raises questions of law or fact common to the questions of law or fact raised by the claim ... of each member of the class, (3) the claim ... of the representative party is typical of the claim ... of each member of the class, and (4) the representative party can fairly and adequately protect and represent the interests of each member of the class."
[7] Moreover, this Court and other Florida courts have recognized the impropriety of class certification in cases comparable to this one. See Norwegian Cruise Lines Ltd. v. Rose, 784 So.2d 1248, 1248 (Fla. 3d DCA 2001)(reversing certification of class of cruise ship passengers who became ill by ship's food and water due to "insufficient commonality"); Stone v. Compuserve Interactive Services, Inc., 804 So.2d 383 (Fla. 4th DCA 2001) (upholding denial of certification because of individualized fact issues and numerous differences in state laws governing different class members' claims); Chateau Communities, Inc. v. Ludtke, 783 So.2d 1227, 1231 (Fla. 5th DCA 2001) (reversing certification of mobile home owners class asserting fraud claims because a host of issues would have to be considered individually); see also Hoechst Celanese Corp. v. Fry, 753 So.2d 626, 628 (Fla. 5th DCA)(reversing certification of class of plumbing system owners asserting fraud claims because individual issues "not only predominate, but overwhelm, any common issues"), rev. denied, 773 So.2d 55 (Fla.2000); Execu-Tech Bus. Sys., Inc. v. Appleton Papers, Inc., 743 So.2d 19 (Fla. 4th DCA 1999)(affirming refusal to certify class of fax paper purchasers alleging unfair trade practices since individual issues predominate); Humana, Inc. v. Castillo, 728 So.2d 261, 264 ("class actions seeking relief from separate contracts on the basis of fraud, whatever the genesis of the fraud, are prohibited"), rev. dismissed, 741 So.2d 1134 (Fla. 1999).
[8] After the year-long "common issues" trial in Phase 1, it took another five months to try the claims of just three individuals. Each of these three class representatives' cases required lengthy proof to establish the individualized elements of their claims. In Phase 3, each of the hundreds of thousands of others (at least 700,000 by the plaintiffs' estimate) will necessarily have to do the same.
[9] Phase 2 effectively demonstrated that specific medical causation is inherently individualized. For example, even though Ms. Farnan and Ms. Della Vecchia both developed "lung cancer," at least fourteen different experts were required to testify on that issue. With respect to Ms. Farnan, plaintiffs presented extensive testimony about her two independent primary cancers, her family history of cancer, her unique symptomology, and whether her lung cancer was really a BAC form of lung cancer (which the jury in Phase I had decided was not caused by smoking). With respect to Ms. Della Vecchia, there was extensive evidence about her treatment regime, unique medical history, and whether she had a "scar cancer" which is a different type of cancer also not associated with smoking.
[10] There is no legal or factual support for the plaintiffs' "presumed reliance" argument. The plaintiffs suggest that class-wide liability can be created by presuming that every class member actually and reasonably relied on whatever unspecified statement(s) the jury found in Phase 1 to be false. The fatal flaw in this argument is that the plaintiffs never proved that every class member even saw or heard whatever statement(s) the Phase 1 verdict rests upon. Moreover, Florida law bars any presumption of reliance in cases involving fraud. See Humana, Inc. v. Castillo, 728 So.2d 261, 264-65 (Fla. 2d DCA 1999) (reliance requirement in common-law fraud cases cannot be satisfied by assumptions; class actions seeking relief from separate contracts on the basis of fraud are prohibited, irrespective of the genesis of the fraud); but see Davis v. Powertel, Inc., 776 So.2d 971 (Fla. 1st DCA 2000) (damage claims brought pursuant to Florida Deceptive and Unfair Trade Practices Act are different from common law fraud claims because plaintiff need not demonstrate individual reliance on relevant representation or omission and, therefore, such claims may be asserted on behalf of a class), review denied, 794 So.2d 605 (Fla.2001).
[11] The Phase 2 trial also evidenced that individualized inquiries with regard to each smoker's awareness of the health risks of smoking at various points in time will be required in the Phase 3 trial. For example, Ms. Farnan testified that she was clearly aware of the health risks. In 1978, when she was 23, her father was diagnosed with a heart condition, and his doctor told Ms. Farnan that smoking had caused the condition. She later went to nursing school, where she received further information about the health effects of smoking. By the mid-1980's, she became "convinced" that smoking causes disease; nonetheless, she "absolutely wanted to continue smoking." In contrast, Mr. Amodeo testified that he believed that it had not been scientifically proven that smoking was addictive or caused lung cancer because he "didn't believe that the government would allow cigarettes to be sold if they were unsafe."
[12] The defendants raised a number of affirmative defenses to the plaintiffs' claims, including comparative fault, which common sense dictates requires individualized proof. However, the plaintiffs assert there is no need for individualized proof on these issues, essentially claiming that all class members were affected by the defendants' allegedly wrongful and conspiratorial conduct in the same way.

This is simply not so as evidenced by the fact that the jury assessed different comparative fault percentages for each of the Phase 2 plaintiffs (Amodeo 25%, Farnan 20%, Della Vecchia 15%). The degree of fault the jury attributed to each defendant varied significantly among each of the three plaintiffs. Thus it is apparent that evaluation of each class members' comparative fault, will require experts on both sides to consider issues unique to each smoker, such as influences from friends and family members, exposure to information and/or propaganda regarding smoking, addiction issues, and actual knowledge of an injury or claim. It is impossible to determine such facts without mandating an individual inquiry into the specifics of each plaintiffs class members' circumstances.
[13] Proof of damages alone consumed several days of testimony with respect to each Phase 2 plaintiff. For example, on issues unique to Ms. Della Vecchia's alleged damages, the jury heard testimony from Ms. Della Vecchia herself, her husband, her two children, her sister, her brother-in-law, her family minister, and an economist. Comparable damages testimony will be required for each class member in Phase 3.
[14] Additionally, the circumstances of particular named plaintiffs confirmed the likelihood of other states' laws applying to the plaintiffs' claims. For example, Mr. Starr, originally a named plaintiff, started smoking in Colorado, became a regular smoker in Colorado, and suffered his alleged smoking-related problems in Colorado. Mr. Starr's only connection with Florida was that he moved here a few months before suit was filed. Unlike Florida, Colorado requires that punishable conduct be proven beyond a reasonable doubt for purposes of assessing punitive damages. See Colo.Rev.Stat. Ann. § 13-25-127(2). The choice-of-law determination under such circumstances is obviously crucial.

Similar choice-of-law concerns are apparent with Mr. Amodeo and Ms. Della Vecchia. The Phase 2 trial revealed that Mr. Amodeo and Ms. Della Vecchia began and continued to smoke for much of their lives in Michigan and New York, respectively. Punitive damages are not available under Michigan law. See Jackovich v. General Adjustment Bureau, Inc., 119 Mich.App. 221, 326 N.W.2d 458 (1982).
[15] Ironically, in support of a separate argument, the plaintiffs' brief boasts an award of $79.5 million dollars in punitive damages was entered in another case for "a single deceased smoker."
[16] The only determinations of liability that have been made so far in this case were made in Phase 2, and those determinations have been made with respect to only three individualsMr. Amodeo, Ms. Della Vecchia, and Ms. Farnan. Beyond these three individuals, the defendants have not been found liable to any class member on any legal theory, much less on any theory for which punitive damages are available in this case, i.e., fraud, conspiracy to defraud, and emotional distress.
[17] See also Brian H. Barr, Engle v. R.J. Reynolds: The Improper Assessment of Punitive Damages for an Entire Class of Injured Smokers, 28 Fla. St. U.L.Rev. 787, 824 (2001) (the Engle trial plan violated "both Florida law and the [defendants'] due process rights" by awarding "punitive damages to an entire class of injured Florida smokers prior to any findings of individual liability and individual harm for each class member").
[18] For example, in Southwestern Ref. Co. v. Bernal, 22 S.W.3d 425 (Tex.2000), the Texas Supreme Court struck down a trial plan strikingly similar to the one presented here. The plan in Bernal provided that the jury would determine in Phase I whether defendants were grossly negligent; if it determined that they were, the jury would proceed in Phase II to assess an amount of punitive damages for the entire class. Individual trials would follow in Phase III. The intermediate appellate court largely endorsed the plan but held that the jury could not assess punitive damages without first making some findings of individual liability; it therefore modified the plan to require proof of compensatory damages by nineteen class representatives out of a putative class of 904 individuals before the assessment of class-wide punitive damages. The Texas Supreme Court reversed, finding that the modified trial plan was just as flawed as the original. It held that the modified trial plan improperly "allowed the jury [to] decide punitive damages for the entire class without knowing the severity of the offense or the extent of compensatory damages, if any, for each of the 885 plaintiffs." Southwestern Ref. Co. v. Bernal, 22 S.W.3d at 433.
[19] The plaintiffs in Ault were escaped inmates who, when recaptured, alleged a police dog was ordered to "bite and scratch them" while they were handcuffed. The plaintiffs sued for assault and battery, and one of them was awarded $0 in compensatory damages and $5000 in punitive damages. The Florida Supreme Court noted the general rule that "exemplary or punitive damages are not recoverable in an action of tort unless actual damages are shown." Ault v. Lohr, 538 So.2d at 455 (citations omitted). It then clarified its prior decision in McLain v. Pensacola Coach Corp., 152 Fla. 876, 13 So.2d 221 (1943), and held that a jury finding of liability is the equivalent of finding nominal damages. Thus, a jury may assess punitive damages even if the amount of the actual damages is found to be $0. Ault v. Lohr, 538 So.2d at 456.
[20] The torts of assault and battery which were alleged in Ault do not require proof of actual injury or compensatory damages as elements of liability. See, e.g., Paul v. Holbrook, 696 So.2d 1311, 1312 (Fla. 5th DCA 1997) (battery); Lay v. Kremer, 411 So.2d 1347, 1349 (Fla. 1st DCA 1982) (assault); see also Ault, 538 So.2d at 457 (Ehrlich, C.J., concurring) (assault and battery "do not require proof of actual damage"). In other cases, however, where the alleged torts do require actual injury and compensatory damages, those (and all other) elements of liability must be established before punitive damages may be awarded. See Ault, 538 So.2d at 457 (Ehrlich, C.J., concurring).
[21] For example, fraud and concealment require reliance, proximate causation, actual injury, and compensatory damages. See, e.g., Lopez-Infante v. Union Cent. Life Ins. Co., 809 So.2d 13, 15 (Fla. 3d DCA 2002); Jones v. Gen. Motors Corp., 24 F.Supp.2d 1335, 1339 (M.D.Fla.1998). Similarly, an "emotional distress" claim requires not only actual injury and compensatory damages, but also a showing of proximate causation and proof that the particular plaintiff suffered severe emotional distress. See, e.g., De La Campa v. Grifols America, Inc., 819 So.2d 940, 943 (Fla. 3d DCA 2002); Dominguez v. Equitable Life Assurance Soc'y, 438 So.2d 58, 59 (Fla. 3d DCA 1983); Stockett v. Tolin, 791 F.Supp. 1536, 1556 (S.D.Fla.1992). Moreover, affirmative defenses must be adjudicated before liability can be established. See Hospital Correspondence Corp. v. McRae, 682 So.2d 1177 (Fla. 5th DCA 1996); Kiser v. Jones, 488 So.2d 554 (Fla. 3d DCA 1986).
[22] See supra, page 445.
[23] This has been established during the Phase 2 trial of the individual plaintiffs. As discussed earlier, each of the three plaintiffs had uniquely different circumstances which directly impacted issues of liability and damages. This demonstrates their claims were inherently individualized.

Significantly, none of the three plaintiffs presented a proper claim within the class action. The jury expressly found that plaintiff Amodeo's claims were time-barred. According to the jury, Amodeo knew or should have known, more than four years before the suit was filed, that he was addicted to smoking and that his cancer could have been caused by smoking. Amodeo's knowledge thus barred his claims under the four-year statute of limitations. See § 95.11(3), Fla. Stat. (2001).
However, the trial court ruled that the statute did not bar Amodeo's fraud and conspiracy claims and barred only his other claims (strict liability, implied warranty, express warranty, negligence, and "emotional distress"), citing to Pulmosan Safety Equip. Corp. v. Barnes, 752 So.2d 556 (Fla.2000). This was clearly error.
First, Amodeo's knowledge barred all of his claims equally, including his fraud claim and his derivative conspiracy claim. See § 95.031(2)(a), Fla. Stat.(2001) ("an action for fraud ... must be begun within [the four year period] ... running from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence"); Korman v. Iglesias, 825 F.Supp. 1010, 1015 (S.D.Fla. 1993) (facts giving rise to a fraud claim are discovered when plaintiff has notice of facts different from what was allegedly represented).
Amodeo asserted that he had been defrauded into believing that cigarettes were safe and not addictive. According to the jury's verdict, however, he discovered the opposite more than four years before the present case was filed. His fraud and conspiracy claims were therefore time barred, just like his other claims.
Second, Pulmosan Safety Equip. Corp. v. Barnes, 752 So.2d at 556 (Fla.2000), does not establish an exception to the statute of limitations bar in the case of continuing fraud. The trial court's reliance on Pulmosan is misplaced. Pulmosan involved the statute of reposethe relevant provision here is the statute of limitations. Moreover, Pulmosan did not address fraud claims, and with respect to the different type of claims involved in Pulmosan, the Supreme Court merely held that it was unconstitutional for a statutory time bar to begin running until the injury was discovered. No similar issue was presented here, given the jury's finding that discovery took place more than four years before this suit was filed. See Carter v. Brown & Williamson Tobacco Corp., 778 So.2d 932 (Fla.2000) (statute of limitations begins to run when plaintiff discovers a smoking-related injury), cert. denied, 533 U.S. 950, 121 S.Ct. 2593, 150 L.Ed.2d 751 (2001); Korman, 825 F.Supp. at 1015. The trial court erred in refusing to apply the jury's findings to Amodeo's fraud and conspiracy claims. Judgment should have been entered for the defendants as to all of Amodeo's claims.
Similarly, judgment should have been entered in favor of the defendants as to individual plaintiffs Farnan and Della Vecchia because their claims did not accrue until years after the cut-off date for class membership. Class membership is a prerequisite to participating in and receiving the benefits of a class action trial. See Garrish v. United Auto., Aerospace & Agric. Workers of America, 149 F.Supp.2d 326, 331 (E.D.Mich.2001)(class membership must be defined to allow the court "to determine who would be entitled to relief, who would be bound by a judgment, and who is entitled to notice of the action"). The date of class certification sets the cut-off date for class membership. See Davis v. Ball Mem'l Hosp. Ass'n, 753 F.2d 1410, 1420 (7th Cir.1985)(referring to "the time the statewide class was certified" as the relevant cut-off); Walker v. Haynes, 659 F.2d 46, 47 (5th Cir. 1981).
The class in this case was certified on October 31, 1994, and the order specifically referred to smokers "who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine." By its terms, the class definition includes only those smokers who developed a disease by October 31, 1994. Since Farnan was diagnosed in April 1996, and Della Vecchia was diagnosed in February 1997, they are clearly excluded from the class and the judgment in their favor must be reversed.
[24] Moreover, the three class representatives were hand-picked by plaintiffs' counsel and cannot be viewed as a statistically significant nor representative "sample." No statistical authority would condone an extrapolation of findings from three handpicked individuals to a population of 700,000. See, e.g., In re Chevron U.S.A., Inc., 109 F.3d 1016, 1019 (5th Cir.1997) ("the sample must be a randomly selected one of sufficient size so as to achieve statistical significance"); In re Dow Corning Corp. 211 B.R. 545, 572 n. 27 (Bankr. E.D.Mich.1997) (the sample "must be selected at random and must be representative of the group"); Manual for Complex Litigation § 33.27 (3d ed.1995).
[25] In Agency for Health Care Admin. v. Assoc. Indust. of Florida, Inc., 678 So.2d 1239 (Fla. 1996), the Florida Supreme Court rejected the kind of irrebuttable presumption of uniform, aggregate liability suggested by the plaintiffs "extrapolation" theory as illogical and violative of the Florida Constitution. The case involved a statute that allowed the state to recoup Medicaid payments from the tobacco industry "on behalf of an entire class" of unidentified Medicaid recipients. The statute was found to be unconstitutional because it deprived tobacco companies of their rights under Florida law to defend against each claim. The statute effectively created an irrebuttable presumption that every Medicaid payment was proper and resulted from smoking. This was held improper.

Similarly, "extrapolation" in the present case creates an irrebuttable presumption that 700,000 or more unidentified individuals suffered injuries comparable to those suffered by the three class representatives. The presumption is irrebuttable because the $145 billion award will remain fixed, even if Phase 3 reveals that the vast majority of class members did not suffer such injuries. Such an irrebuttable presumption would clearly violate the law applied in Agency for Health Care Administration.
[26] In State Farm, the United States Supreme court reversed the Utah Supreme Court's decision upholding a punitive award of $145 million where the compensatory award was $1 million. The Supreme Court reiterated that punitive damages must be reasonable and proportionate to the harm suffered by the plaintiff. The Court cautioned: "Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of [a] reprehensibility analysis." State Farm, 123 S.Ct. at 1516. In sum, punitive damages cannot be assessed in the aggregate. Punitive damages must be assessed on an individual basis, in relation to each class member's compensatory damages, if any.
[27] Federal due process also prohibits "excessive" punitive awards. See, e.g., Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. at 424, 121 S.Ct. 1678; BMW of North America, Inc. v. Gore, 517 U.S. at 562, 116 S.Ct. 1589; TXO Prod. Corp. v. Alliance Resources Corp., 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993).
[28] Florida courts routinely use net worth to determine whether a punitive award is bankrupting or excessive. See Lipsig v. Ramlawi, 760 So.2d at 189 (punitive award held improper because it was 1.12 times defendant's net worth and thus would result in defendant's "financial demise"); Turner v. Fitzsimmons, 673 So.2d 532, 536 (Fla. 1st DCA 1996)(net worth evidence critical to determination of excessiveness of punitive award); Hockensmith v. Waxler, 524 So.2d at 715 (net worth evidence used by the court to determine punitive award was excessive); see also Brooks v. Rios, 707 So.2d at 376 (evidence of net worth must be presented to preserve the defendant's right to argue excessiveness of award on appeal). Here, the defendants properly established their net worth and ability to pay through the testimony of each manufacturer's CEO and through the introduction of the defendants' audited financial statements. See Rety v. Green, 546 So.2d 410 (Fla. 3d DCA 1989) (president's testimony plus audited financial statements admissible as evidence of financial worth); Salvage & Surplus, Inc. v. Weintraub, 131 So.2d 515, 516 (Fla. 3d DCA 1961) (knowledgeable corporate officer can testify as to value); see also Witchell v. Londono, 707 So.2d 796, 799 n. 2 (Fla. 1st DCA 1998) (corporate officer with knowledge of relevant values is qualified to testify); Mercury Marine Div. of Brunswick Corp. v. Boat Town U.S.A., Inc., 444 So.2d 88, 90 (Fla. 4th DCA 1984) (corporate officer's testimony established loss of business value); Alexander v. Alterman Transp. Lines, Inc., 387 So.2d 422, 424 (Fla. 1st DCA 1980) (financial statements provided sufficient evidence of financial worth upon which to base punitive award).

Significantly, the plaintiffs' "experts" (who were neither CPA's nor accounting experts), never refuted the defendants' audited financial statements. Net worth and ability to pay can be determined only through the objective application of generally accepted accounting principles. See, e.g., Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1200 n. 3 (11th Cir. 2001); Southwest Whey, Inc. v. Nutrition 101, Inc., 188 F.Supp.2d 986, 989 (C.D.Ill.2002); Wilson v. Gillis Adver. Co., 145 F.R.D. 578, 582 (N.D.Ala.1993). The defendants clearly met their burden of proving net worth and ability to pay through the objective evidence presented in the form of their audited financial statements.
[29] Similarly, each defendant-specific award is a multiple of that defendant's individual net worth, as proven at trial. The $73.96 billion dollar award against Philip Morris was roughly twelve times its net worth of $6.4 billion. The $17.59 billion dollar award against Brown & Williamson was roughly twenty times its net worth of $894 million. The $16.25 billion dollar award against Lorillard was roughly eighteen times its net worth of $921 million. The $790 million dollar award against Liggett was twenty-three times its net worth of $33.8 million.

Furthermore, the jury awarded $36.28 billion dollars against Reynolds, even though plaintiffs' "expert" admitted that Reynolds had a negative tangible net worth after the exclusion of good will, which is not a saleable asset. Reynolds also showed that its 1999 income from continuing operations nationwide was only $195 million. Even after assigning a zero net worth to Reynolds, defendants showed a combined net worth of no more than $8.3 billion.
[30] Moreover, even if an award is not bankrupting, it must be reasonable and proportionate to the harm suffered and cannot be justified solely upon the wealth of the defendant. See State Farm, 123 S.Ct. at 1525 ("The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award."). As noted by the United States Supreme Court in Honda Motor Co. v. Oberg, 512 U.S. 415, 432, 114 S.Ct. 2331, 2341, 129 L.Ed.2d 336 (1994): "This Court has not hesitated to find proceedings violative of due process where a party has been deprived of a well-established common-law protection against arbitrary and inaccurate adjudication. See, e.g., Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749. Punitive damages pose an acute danger of arbitrary deprivation of property, since jury instructions typically leave the jury with wide discretion in choosing amounts and since evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses."
[31] As explained recently by the United States Supreme Court, an excessive award of punitive damages does not further a legitimate state purpose and constitutes an arbitrary deprivation of property in violation of the Due Process Clause of the Fourteenth Amendment. See State Farm, 123 S.Ct. at 1519-20. Stressing the importance of de novo appellate review to prevent excessive jury awards resulting from arbitrary passion or prejudice, the Court noted: "Exacting appellate review ensures that an award of punitive damages is based upon an `application of law, rather than a decisionmaker's caprice.'" State Farm, 123 S.Ct. at 1520-21 (citations omitted).
[32] The United States Supreme Court has recently noted that the danger of a punitive award resulting in an arbitrary deprivation of property is heightened where a jury is presented with evidence of net worth or evidence that has little bearing as to the amount of punitive damages that should be awarded. See State Farm, 123 S.Ct. at 1519-20. The Court in State Farm cautioned that "[v]ague instructions, or those that merely inform the jury to avoid `passion or prejudice,' do little to aid the decisionmaker in its task of assigning the appropriate weight to evidence that is relevant and evidence that is tangential or only inflammatory." State Farm, 123 S.Ct. at 1520 (citations omitted).
[33] Later counsel presented an expert who testified that defendants' advertising had "perpetuated" the "racial segregation" of America through the 1970's and 1980's. In cross-examining an historian called by the defense, plaintiffs' counsel suggested that the witness admired Vice President John Calhoun, a defender of slavery before the Civil War, because the witness's resume included studies of Calhoun. Plaintiffs' counsel used this as an excuse to make the following speech about slavery:

[Y]ou know, according to people like Calhoun, there were two sides to that story. I mean, one side was: let's abolish slavery, and let's give people their freedom. And the other side was espoused by an intellectual such as Calhoun: No, slavery is okay. It's good. We need it. It's good for the South, good for the economy. Correct? There were two sides to that issue, according to people like Calhoun.
Over objection, plaintiffs' counsel continued to refer to defenders of slavery and to the poll tax, Strom Thurmond, and similar irrelevancies. The court acknowledged the comments were improper and gave the jury the following patently ineffective "curative" instruction: "We've gone into the past as far as this subject is concerned, and there's a lot about the discussion that we've had up to this point that has no relevancy or materiality [to] the issues in the trial. We understand that. Some sensitive issues have been raised back in the 1800s that [have] nothing to do with this case. So we'll proceed with that concept in mind. Go ahead."
Plaintiffs' counsel continued to engage in the same misconduct immediately thereafter. Nevertheless, the court did nothing more than sustain defendants' further objection, out of the hearing of the jury.
[34] The record reflects the following exchange:

[Plaintiffs' counsel] "You want to be fair, and you say: Right, there's two sides to every question. What's the other side to the holocaust? What is it?
[Defense counsel]: Objection your honor.
[Plaintiffs' counsel, ignoring the objection]: What is the other side to slavery?
[35] In FDA v. Brown & Williamson, 529 U.S. at 137, 120 S.Ct. 1291, the Supreme Court noted that Congress has foreclosed the removal of tobacco products from the market since at least 1938. Moreover, during the period from 1965 to 1992a period in which "the adverse health consequences of tobacco use were well known, as were nicotine's pharmacological effects"Congress passed various statutes that "directly addressed the problem of tobacco and health," while continuing to uphold the legality of selling cigarettes. FDA v. Brown & Williamson, 529 U.S. at 137-38, 120 S.Ct. 1291. See Lorillard v. Reilly, 121 S.Ct. at 2426.

Because the sale of cigarettes is subject to federal regulation, attempts to impose contradictory requirements or prohibitions under state law are subject to at least implied preemption. See, e.g., Insolia, 128 F.Supp.2d at 1225 ("allowing tort actions against cigarette manufacturers and sellers for the allegedly negligent act of continuing to make and sell cigarettes would interfere with Congress's policy in favor of keeping cigarettes on the market"); see also, Geier v. American Honda Motor Co., 529 U.S. 861, 865, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (federal regulation of car manufacturers preempted state-law tort claims); cf., Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341, 350, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) (state-law claims based on alleged misrepresentations to a federal regulatory agency were preempted).
[36] The record reflects counsel stated: "Let's discuss the concept of legal in the context of America. I noticed in last week's newspaper Rosa Parks, who is 86 years old, got the Congressional Gold Medal because in 1955 [objection]she refused."

The defendants interrupted with an objection, which the court sustained. However, a short time later plaintiffs' counsel resumed what he had startedan appeal to civil disobedience, by commenting: "We look back in history. The whole civil rights movement of the '60s was fighting against unjust laws. Dr. King was arrested in the '60s."
Counsel continued: "Other people were arrested in the '60s because although this is a court of law, a court ofI remember as a kid walking into this building."
Although the court sustained defendants' objection at this point, counsel ignored the ruling and went on: "In this building, in this building, a temple to the law, they were there were drinking fountains which said Whites Only. I tell my kid[ ] about that. He said: how did you put up with this, daddy?" Counsel then added: "The point I'm making is, the point I'm making, that some day, some day our kids and grandchildren are going to say ... [h]ow did you let them get away with it? How did you let them get away with it?" Despite the court's ruling sustaining defendants' prior objection, counsel succeeded in completing his improper argument to the jury.
[37] That the prejudice was irreparable cannot be denied. After the Phase 1 closing arguments, the defendants discovered a book authored by plaintiffs' counsel in which he admits having used, almost verbatim, the same race-based nullification arguments in an earlier case (a murder trial in which he obtained an acquittal) and specifically emphasizes that such arguments are effective because they are incurably prejudicial. Stanley Rosenblatt, Murder of Mercy: Euthanasia on Trial (1992).

Plaintiffs' counsel, Mr. Rosenblatt, declares in his book that: "When the law conflicts with common sense, common decency and simple fairness and justice, it is the law that must yield." Although he concedes that attorneys cannot explicitly tell a jury to "ignore the law", Mr. Rosenblatt boasts of his ability to persuade juries "in a subtle way" to nullify the law: "The area I would need to spend the most time on [during trial] was my `Piss on the Law' theme. Whenever I came close to being direct on that subject the State would object, and their objections would always be sustained. I had to figure a way to tell the jury in a subtle way that they should disregard the law."
The book describes Mr. Rosenblatt's tactics for obtaining jury nullification through racial pandering and references to unjust laws: "I assured [my client] that I would get out my words about Martin Luther King and the unjust laws he fought against. That guaranteed that the prosecutors would be on their feet in a flash, but the black juror, the black male alternative, and the white jurors would know exactly where I was coming from." A review of the comments made during the Phase 1 closing and those referred to in the book, reveals Mr. Rosenblatt followed the script he had previously laid out in his book, almost to the letter. Plaintiffs' counsel, Mr. Rosenblatt, was well aware that the nullification arguments and racial appeals he presented to the jury in this case would result in incurable prejudice.
[38] The trial court itself recognized (during Phase 2) that even if an objection is sustained, "once it's out, it's out."
[39] The plaintiffs' attempt to distinguish the defendants' cited cases by stating, without elaboration, that Brooks v. Rios, 707 So.2d 374 (Fla. 3d DCA 1998), and Bould v. Touchette, 349 So.2d 1181 (Fla.1977), do not support the defendants' position. However, the defendants' answer brief quotes both opinions, and these opinions expressly identify the relevant benchmark as "net worth at the time of trial," not some indefinite time in the future. The plaintiffs further claim that Welty v. Heggy, 145 Wis.2d 828, 429 N.W.2d 546, 549 (1988), and Jonathan Woodner Co. v. Breeden, 665 A.2d 929, 940-41 (D.C.1995), are distinguishable because in both cases the plaintiff had the burden of proving defendant's "wealth and ability to pay." This is a non sequitur. The proper definition of "ability to pay" does not vary depending on who has the burden of proof. Finally, plaintiffs suggest that Bienvenu v. Dudley, 682 So.2d 281, 285 (La.Ct.App.1996), conflicts with Florida law because it prohibited the jury's consideration of a defendant's "future worth or earning capacity `unless reasonably certain.'" In fact, Florida law imposes this same requirement (see, e.g., Wransky v. Dalfo, 801 So.2d 239, 242 (Fla. 4th DCA 2001)), which the plaintiffs now seek to avoid.
[40] The plaintiffs' argument that counsel's references to payouts was justified, is unavailing. The plaintiffs cite to criminal cases and statutes specifically allowing fines and restitution to be paid in installments. There are no similar provisions for the payment of punitive damages in a civil case. No case supports the assumption of a twenty-five year payout for the purposes of assessing punitive damages.
[41] Plaintiffs' counsel was fined $5,000 and warned that any subsequent reference to a payout would cost him $100,000.
[42] The court stated: "Now, the record does reflect I made a ruling [prohibiting plaintiffs' references to a payout]. And it will also reflect that I did admonish Mr. Rosenblatt not to do it again, and, unfortunately, he did; not only once, he did it several times.... I let it slide, and maybe I should not have.... But this being as unusual case as it is, I sort of took a back seat on some of these admonition issues and I didn't do anything definitive, and I really feel that maybe I should have, in retrospect." The trial court expressly recognized that plaintiffs' counsel inundated the jury with improper references to extended payments.
[43] Hundreds of federal court cases are in accord. See e.g. Bird v. Glacier Elec. Coop., Inc., 255 F.3d 1136, 1151 (9th Cir.2001)(racial stereotyping will not be condoned in civil cases; reversing judgment in favor of plaintiff Indian owned company where plaintiff's counsel made inflammatory comments regarding Indians to a jury consisting entirely of Indian tribal members); United States v. Doe, 903 F.2d 16, 24-28 (D.C.Cir.1990) (reversing conviction where racially inflammatory remarks were made during summation); Miller v. North Carolina, 583 F.2d 701, 704, 706-08 (4th Cir.1978) (same).
[44] In the face of counsel's misconduct, the court's determination to proceed at any cost was an abdication of its most basic duty. "[U]nless trial judges are willing to grant mistrials or new trials based upon prejudicial conduct of counsel, there will be no elimination of such conduct." Murphy v. Murphy, 622 So.2d 99, 102(Fla. 2d DCA 1993). As this Court stated in Gomez v. State, 751 So.2d 630, 632-33 (Fla. 3d DCA 1999):

There comes a point and time in the conduct of a trial that the trial judge should and must intervene in the egregious conduct, whether it has been challenged or not. It is the trial judge who is the central figure in the courtroom especially in the eyes of a jury. The jury looks to the trial judge as the only neutral, impartial, detached participant in the trial.
In my view, the trial court erred in deciding not to grant a mistrial simply because this was a lengthy trial.
[45] The defendants point out that this is not the first time plaintiffs' counsel, Mr. Rosenblatt, has engaged in the type of misconduct requiring reversal. In Maercks v. Birchansky, 549 So.2d 199 (Fla. 3d DCA 1989), this Court reversed a judgment in favor of the plaintiff based upon the improper arguments and conduct of her attorney, Mr. Rosenblatt. Similar to the present case, in Maercks, Mr. Rosenblatt improperly made derogatory comments about opposing counsel and "asserted his personal opinion as to the credibility of a witness, the justness of his client's cause and the perfidy of the defendant." Regardless of the fact that some objections to the improper remarks were sustained, we reversed for a new trial based upon Mr. Rosenblatt's impermissible conduct.
[46] It is aphoristic that a plaintiff cannot prevail on claims for negligence, breach of warranty or strict liability, unless the plaintiff establishes that the product which allegedly caused the plaintiff's injury was manufactured or sold by the defendant. See Mahl v. Dade Pipe and Plumbing Supply Co., Inc., 546 So.2d 740 (Fla. 3d DCA 1989). Here, it is undisputed that the Liggett defendants did not manufacture or sell any of the products that allegedly caused injury to the individual plaintiff representatives. It is also undisputed that the jury found the Liggett defendants zero percent at fault with respect to each of the named plaintiffs. The inconsistency in the verdict alone, fundamentally undermines the verdicts underlying basis and requires reversal. See Garriga v. Guerra, 753 So.2d 146 (Fla. 3d DCA 2000); Chabad House-Lubavitch of Palm Beach Cty., Inc. v. Banks, 602 So.2d 670 (Fla. 4th DCA 1992); Wharfside Two, Ltd. v. W.W. Gay Mechanical Contractor, Inc., 523 So.2d 193 (Fla. 1st DCA 1988).
[47] The jury awarded $790 million dollars in punitive damages against the Liggett defendants. This amount is twenty-three times Liggett's net worth, almost twice Liggett's gross revenues, ten times Liggett's operating income, and ten times Liggett's current assets. There was no valid evidentiary or legal basis for the jury's Phase 1 and Phase 2 findings regarding Liggett. Thus the claims against the Liggett defendants clearly should not have proceeded to the punitive damages phase. Moreover, it is difficult to fathom how the evidence presented could possibly rise to the level of reprehensibility necessary to support punitive damages where most industry experts uniformly praised Liggett as a model for how a tobacco company should conduct itself.
[48] Significantly with regard to the general verdict against all the defendants, there were no specific findings as to any act by any defendant at any period of time. The trial plan enabled the plaintiffs to try fifty years of alleged misconduct that they never would have been able to introduce in an individual trial, which was untethered to any individual plaintiff. The plaintiffs incited juror prejudice against an unpopular industry and created a composite plaintiff who smoked every single brand of cigarettes, saw every single advertisement, read every single piece of paper that the tobacco industries ever created or distributed, and knew about every single allegedly fraudulent act. It was error to permit the plaintiffs to use the class procedural device in order to alter the substantive rights of the parties in their favor.
[49] For example, the MSA: (a)dissolves the Council for Tobacco Research and the Tobacco Institute; (b)prohibits the targeting of youths in cigarette advertising, promotion, or marketing; (c)bans virtually all outdoor and transit advertising of tobacco products, including billboards; (d)bans the production, distribution, or sale of tobacco brand name products such as caps, jackets, and bags; (e) prohibits any agreement to limit or suppress research on the health effects of tobacco; (f)prohibits the making of any material misrepresentation of fact regarding the health consequences of using any tobacco product; and (g)provides for publication on the internet of a vast number of documents produced in discovery in past and future cases against the tobacco industry. Pursuant to the MSA, the attorneys general have the authority to monitor defendants' compliance and to enforce the MSA in court. In the event of a continuing violation, an attorney general may seek monetary fines, civil contempt, or even criminal sanctions.
[50] Although the instruction allowed the jury to consider the FSA and MSA on the issue of "changed conduct," this language does not equate with directing the jury to consider the agreements as to the need for punishment and deterrence. The two sentences of the instruction would negate each other, if "changed conduct" were interpreted as equivalent to the need for "punishment" and "deterrence." Such an interpretation would invalidate the instruction as contradictory and confusing. See, e.g., Jacobs v. Westgate, 766 So.2d 1175 (Fla. 3d DCA 2000) (reversal required "where a jury might reasonably have been misled, regardless of whether it has actually been misled"); Poole v. Lowell Dunn Co., 573 So.2d 51 (Fla. 3d DCA 1990)(same).
[51] Class certification significantly increases the number of unmeritorious claims and dramatically affects the stakes for defendants. See Agent Orange, 818 F.2d at 165-66. Defendants are more likely to be found liable in class action litigation and the damage awards in such proceedings are significantly higher. See Manual For Complex Litigation § 33.26 n. 1056; Kenneth S. Bordens and Irwin A. Horowitz, Mass Tort Civil Litigation: The Impact of Procedural Changes on Jury Decisions, 73 Judicature 22 (1989). Aggregation of claims places insuperable pressure upon defendants to settle, rather than face the unacceptably high risk of an all-or-nothing verdict; settlements by defendants in these cases have been referred to as "judicial blackmail." See Peter H. Schuck, Mass Torts: An Institutional Evolutionist Perspective, 80 Cornell L.Rev. 941 (1995); Rhone-Poulenc Rorer, Inc., 51 F.3d at 1293 (7th Cir.1995).